UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Case No.  17-35623 |
| OFFSHORE SPECIALTY FABRICATORS, LLC, | CHAPTER 11 |
| Debtor. | |

**MODERN AMERICAN RECYCLING SERVICE, INC.'S
PRELIMINARY OBJECTION TO AND RESERVATION OF RIGHTS
WITH RESPECT TO DEBTOR'S DISCLOSURE STATEMENT**

Modern American Recycling Service, Inc. ("MARS"), a creditor of the Debtor in the above referenced chapter 11 case, by and through its undersigned attorneys, respectfully submits this preliminary objection (the "Preliminary Objection") to *Debtor's Disclosure Statement in Support of the Plan of Reorganization of Debtor Offshore Specialty Fabricators, LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 372] (the "Disclosure Statement").  In support of its Preliminary Objection, MARS states as follows:

## INTRODUCTION

1. The Debtor's Disclosure Statement should not be approved for several reasons. First, the Disclosure Statement should not be approved because the Plan is patently not confirmable.  The Plan proposes non-consensual, non-debtor third party releases that violate Bankruptcy Code section 534(e) and Fifth Circuit jurisprudence.  The proposed Plan also violates Bankruptcy Code section 1129 and the absolute priority rule by allowing Member Interests to ride through the bankruptcy unaffected despite serious concerns that the unsecured creditors will not be paid in full under the Plan Sponsor Commitment.  Second, the Plan is simply not feasible given current market indications, the information contained in the Debtor's Schedules of Assets and Liabilities and Statements of Financial Affairs, the terms of the Plan

4569879v2

Sponsor Commitment, and the Financial Projections provided by the Debtor in the Disclosure Statement.  <u>Third</u>, the Disclosure Statement provides woefully inadequate information concerning a host of issues, including (but not limited to) the size of the unsecured creditor pool, the payment of administrative expenses and professional fees, the current operations of the Debtor and its future prospects, the basis for its speculative financial projections, and the data supporting the proposed liquidation analysis.  The foregoing reasons alone are enough to deny the Debtors' request for approval of the Disclosure Statement.

## RELEVANT FACTS

**The Debtor and the Bankruptcy Filing**

2. On October 1, 2017 (the "Petition Date"), the Debtor filed its case under chapter 11.

3. MARS, an Alabama corporation with its principle place of business in Gibson, Louisiana, is primarily engaged in the business of processing scrap from vessels and other offshore assets for recycling purposes.  On January 10, 2018, MARS filed Proof of Claim #85 asserting a $1.4 million unsecured claim against the Debtor.  MARS believes it is the largest unsecured creditor of the Debtor.

4. On January 19, 2018, MARS' affiliate, Modern American Railroad Services, LLC, was declared the Prevailing Bidder for the D/B WILLIAM KALLOP at the auction conducted by the Debtor for its two derrick barges.

**The Plan and Disclosure Statement**

5. On January 26, 2018, the Debtor filed its *Plan of Reorganization of Debtor Offshore Specialty Fabricators, LLC Under Chapter 11 of the Bankruptcy Code* [Docket. No. 371] (the "<u>Plan</u>") and the Disclosure Statement.

**ARGUMENT**

**I.   THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE**

6.  The Court should not approve the Disclosure Statement because the accompanying Plan is patently not confirmable as a matter of law. It is well-established that a court may decline to approve the disclosure statement if the underlying plan cannot be confirmed. *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("[I]f it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing."); *In re GSC, Inc.*, 453 B.R. 132, 157 n.27 (Bankr. S.D.N.Y. 2011) ("An unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement that describes a plan patently unconfirmable on its face should not be approved."). Such powers stem from the court's inherent powers that "enable it to control its own docket" and prevent the attendant waste of time and resources involved in pursuing an unconfirmable plan. *In re Am. Cap. Equip., LLC*, 688 F.3d at 154 (citing 11 U.S.C. § 105(a) and *In re Kehn Ranch, Inc.*, 41 B.R. 832, 832–33 (Bankr. S.D. 1984)); *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) (denying approval of disclosure statement describing unconfirmable plan "to avoid . . . a wasteful and fruitless exercise" that would "further delay a debtor's attempts to reorganize"). Accordingly, even if a disclosure statement itself contains adequate information—which the Debtors' Disclosure Statement does not—a "fatally flawed" plan that is "incapable of confirmation" is enough to cut off the confirmation process at the disclosure stage. *In re Criimi Mae, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of

the disclosure statement."); *In re 266 Wash. Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *In re Dakota Rail, Inc.*, 104 B.R. 138, 145 (Bankr. D. Minn. 1989) (denying approval of "facially defective disclosure statement" describing infeasible plan).

7.  The approval of a disclosure statement by a bankruptcy court is an early step in the confirmation process, followed by time consuming and expensive solicitation procedures and confirmation hearings.  *In re 266 Wash. Assocs.*, 141 B.R. at 288.  Soliciting votes and a contested confirmation hearing would be a waste of time and money on a plan that is not confirmable on its face.  As shown below, the Debtor's Plan is patently not confirmable on its face such that proceeding beyond the disclosure statement phase would be a waste of the estate's and creditors' resources.  As a result, the Court should not approve the Disclosure Statement.

  **A.**  **The Plan Violates the Absolute Priority Rule by Allowing the Members to Retain Their Interests When Unsecured Creditors Risk Nonpayment in Full of Their Claims**

8.  The Plan provides that Member Interests will be reinstated on the Effective Date which is a potential violation of the absolute priority rule and 11 U.S.C. § 1129(a)(9)(A) and other provisions of § 1129.  *See DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 94–101 (2d Cir. 2011).  There is no guarantee that the Debtor will be able to pay unsecured creditors in full.  Of the $17 million the Debtor believes it will have on hand as of the effective date, approximately $6.9 million will pay maritime lien claims, $3.2 million will pay off the debtor-in-possession financing, and undetermined amounts will fund a professional fee reserve (which reverts to the Reorganized Debtor and is not used to pay unsecured claims) and pay the Plan Sponsor's fees and expenses (per the Plan Sponsor Commitment).  Furthermore, the Plan does not—nor can it provided it was filed prior to the bar date—accurately value the unsecured claims pending against the estate.

9. Therefore, the Plan provisions providing for reinstatement of Member Interests render the Plan unconfirmable as a violation of the absolute priority rule.

**B.     The Plan is Not Confirmable Because of the Taking of Property by Default**

10. The Disclosure Statement provides:

**If you do not check the box in the ballot provided to you to opt-out of the release provisions, you shall be deemed to have consented to the release provisions set forth in Article IX of the Plan, and unconditionally, irrevocably, and forever released and discharged the Releasees from any and all Causes of Action.**

Disclosure Statement at Art. X.B.

11. Such a provision, however, violates Fifth Circuit law with respect to non-debtor releases. *See In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1061 (5th Cir. 2012) (noting that "prior rulings from this circuit . . . seem[ed] broadly to foreclose non-consensual non-debtor releases and permanent injunctions.") (internal quotations omitted); In *re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) ("In a variety of contexts, this court has held that Section 524(e) only releases the debtor, not co-liable third parties."); *see also In re Olivas*, 129 B.R. 122, 125 (Bankr. W.D. Tex. 1991) (stating the court could not impose "an affirmative duty on the creditor to release a lien, [which] result would be a de facto taking of the Bank's property without due process of law in violation of the Fifth Amendment to the Constitution.").

12. The above quoted Disclosure Statement means that creditors who fail to turn in a ballot or forget to affirmatively opt-out of the release are deemed to release the Debtor and a host of other entities. Even if the Court were to allow a plan that contained non-Debtor releases, the Debtors must solicit the consent of claimants to the releases. In other words, the proposed default provisions are not adequate consent; the Debtor must provide that a creditor must opt-in to granting a non-Debtor release. "Failing to return a ballot is not a sufficient manifestation of

-5-

consent to a third party release." *In re Wash. Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). Likewise, "simply classifying a party as unimpaired does not mean that they should be somehow automatically deemed to grant a release . . . ." *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 270 (Bankr. S.D.N.Y. 2014). The Disclosure Statement fails to address Fifth Circuit law on non-debtor, third-party releases. Therefore, approval of the Disclosure Statement should be denied.

**II. THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION**

13. Section 1125 of the Bankruptcy Code requires that a disclosure statement contain "adequate information;" which means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a); *see also In the Matter of Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988). Congress intended to require a debtor to furnish parties in interest sufficient and relevant financial and operating information "to enable each participant to make an 'informed judgment' whether to approve or reject the proposed plan." *In re Nw. Recreational Activities, Inc.*, 8 B.R. 10, 11 (Bankr. N.D. Ga. 1980).

14. While "[t]he determination of what is adequate information is subjective and made on a case by case basis . . . [and the] determination is largely within the discretion of the bankruptcy court," *Tex. Extrusion*, 844 F.2d at 1157, the case of *In re Metrocraft Pub. Service*, 39 B.R. 567 (Bankr. N.D. Ga. 1984) is often cited for its laundry list of factors bearing on the issue of adequate information. The seventeen *Metrocraft* Factors include:

    1. the events which led to the filing of a bankruptcy petition;

2. **a description of the available assets and their value**;
3. **the anticipated future of the company**;
4. **the source of information stated in the disclosure statement**;
5. a disclaimer;
6. **the present condition of the debtor while in Chapter 11**;
7. the scheduled claims;
8. **the estimated return to creditors under a Chapter 7 liquidation**;
9. the accounting method utilized to produce financial information and **the name of the accountants responsible for such information**;
10. **the future management of the debtor**;
11. the Chapter 11 plan or a summary thereof;
12. **the estimated administrative expenses, including attorneys' and accountants' fees**;
13. the **collectability of accounts receivable**;
14. **financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan**;
15. information relevant to the risks posed to creditors under the plan;
16. **the actual or projected realizable value from recovery of preferential or otherwise voidable transfers**;
17. litigation likely to arise in a nonbankruptcy context;
18. tax attributes of the debtor; and
19. **the relationship of the debtor with affiliates**.

*Metrocraft*, 39 B.R. at 568.

15. This Preliminary Objection addresses the twelve bolded *Metrocraft* factors in the above list. Even if the Debtor's Plan was confirmable—which MARS disputes for the reasons set forth in this Preliminary Objection—the Disclosure Statement should not be approved for its failure to provide adequate information in these areas.

    A.    **A Description of the Available Assets and Their Value**

16. While the Disclosure Statement refers to certain assets, namely the D/B WILLIAM KALLOP, there is no explanation regarding the value of this asset, the basis for

stating that repairs to the vessel will amount only to $1.7 million, or how long it will take to get the vessel ready to operation. The Disclosure Statement provides no description or explanation of the "Houma, LA, yard assets" which appear in the Liquidation Analysis.

### B. The Anticipated Future of the Company

17. The Disclosure Statement paints a rosy future for the Debtor. However, the Debtor provides no supporting information for its 2018 and 2019 purported revenue, it does not identify any pending contracts for decommissioning or fabrication work. The Disclosure Statement does not address the extent of repairs, and the necessary time to complete those repairs, for the D/B WILLIAM KALLOP.

### C. The Source of Information Stated in the Disclosure Statement

18. The Disclosure Statement generally cites "management" as the source of information in the Disclosure Statement. However, the Debtor currently has no management, only a Chief Restructuring Officer, and, upon information and belief, only two employees. It is unclear from the Disclosure Statement who is providing the information, financial projections, and assumptions used in the Disclosure Statement and Plan.

### D. The Present Condition of the Debtor While in Chapter 11

19. For good reason, the Disclosure Statement is devoid of any description of the Debtor's current operations while in this Chapter 11 proceeding—there are no operations. In fact, it can be surmised from the Disclosure Statement that the Debtor has not been engaged in operations since, at the earliest, April, 2017. The Debtor does not disclose that it presently has, upon information and belief, only two employees or that there appear to be no pending executory contracts for decommissioning or fabrication services post-emergence. *See* Debtor's Amended Schedule G [Docket No. 184], filed Dec. 8, 2017 (disclosing executory contracts for bathroom

sanitation, apartment lease, offshore wells database, postage meter, website, Houston office lease, and scrapping contract with MARS). There is no information regarding the timeframe for when such executory contracts will be entered into or when work would commence under such contracts.

20. The Disclosure Statement also fails to adequately describe the pending unsecured claims against the Debtor. The Debtor's plan refers only to the approximately $6.1 million in unsecured claims *scheduled* by the Debtor when it originally filed this case. Notwithstanding the deadline to file proofs of claim is not until four days after the hearing on conditional approval of the Disclosure Statement, the Disclosure Statement fails to mention that MARS has filed an unsecured, **unscheduled** claim against the Debtor for $1.4 million.

21. By failing to describe the Debtor's present condition in Chapter 11, the Disclosure Statement fails to provide adequate information such that a creditor can may an informed decision to either accept or reject the plan.

   **E.**  **The Estimated Return To Creditors Under A Chapter 7 Liquidation**

22. The Disclosure Statement fails to adequately discuss the estimated return to creditors under a chapter 7 liquidation. Exhibit B to the Disclosure Statement includes a liquidation analysis for the Debtor's estate. This liquidation analysis includes only brief explanations that provide little color to explain wide variations in assumptions. For example, the liquidation analysis explanation states: "The pre-petition unsecured claims included in this Analysis were estimated based on the claims listed on the Debtor's Schedules of Assets and Liabilities filed in accordance with section 521(a)(1)(B)(i) and proofs of claims ("POCs") filed by creditors in accordance with section 501 of the Code." However, there is no indication which

proofs of claim have been considered, or even an acknowledgement that the liquidation analysis is prepared before the bar date for filing unsecured claims.

23. There is no description in the Disclosure Statement or Plan regarding the "Houma, LA, yard assets" or an explanation of how the Debtor determined these assets were only worth "$700,000-$1,400,000" in a liquidation. There is no explanation with respect to the potential values of the proceeds from the "Montco Receivable," the "Linder Oil Judgment," or the "litigation against Steve Williams." Moreover, the Disclosure Statement does not address the value of certain estate causes of action that the Debtor would release under Plan Article X.B.(a) regarding "any loans made by OSF to any of OSF's employees or other Representatives, or any such employees' or other Representatives' family members or trusts." The Disclosure Statement and Plan fail to explain the nature of these loans, the dates such loans were made, who received these loans, and whether the loans were made to the Debtor's insiders. The significance of these loans cannot be understated to the unsecured creditors in a liquidation—depending on the value, unsecured creditor may fair better under a liquidation than under the Plan.

    **F.    The Accounting Method Utilized To Produce Financial Information and the Name of the Accountants Responsible for Such Information**

24. In the opening disclaimer, the Debtor states that '[e]xcept as specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles." There is no further discussion on what accounting method was used to value assets, make financial projections, or analyze assumptions. The Plan and Disclosure Statement do not identify any accountant or accounting firm responsible for the information including in the Disclosure Statement.

### G. The Future Management of the Debtor

25. Both the Disclosure Statement and the Plan reference a "Plan Supplement." Presumably, the Plan Supplement will include the information necessary for the electorate to make an informed decision on the Plan, including the identification of the Debtor's post-effective date officers. But the Debtor proposes to file the Plan Supplement "not later than the earlier of (i) ten (10) days prior to the commencement of the Confirmation Hearing and (ii) five (5) days prior to the deadline for filing objections to confirmation of the Plan." *See* Plan Art. I.C. However, there is no indication that this will be made available to creditors in advance of any voting deadline and only days before the deadline to file confirmation objections. However, given the relatively few employees currently employed by the Debtor, the identification of the Debtor's officers should be known as of the hearing on the Disclosure Statement. Because the Debtor intends to provide releases to these individuals as well, the creditors need this information to determine whether the individuals deserve to be released. Without the information included in the Plan Supplement, the Disclosure Statement does not provide adequate information.

### H. The Estimated Administrative Expenses, Including Attorneys' and Accountants' Fees

26. Although the Disclosure Statement states that the Reorganized Debtor will establish and fund a "Professional Fee Reserve" on the effective date, *see* Disclosure Statement Art. II.B.2., the is no information regarding the potential expenses that will be funded by this reserve. An unsecured creditor has no way to determine how such a reserve will impact its recovery in this case, especially considering the lack of filed interim fee statements. Without this information, a creditor has no way to determine whether its treatment would be more favorable in a liquidation as opposed to under the Plan.

     **I.**     **The Collectability of Accounts Receivable**

     27.     The Disclosure Analysis fails to provide any information on whether the Debtor has any outstanding accounts receivable, including the amount, aging, counter-party, or a discussion of whether such accounts are collectible.  Although the Debtor does identify three potential causes of action—the Montco Claim, the Linder Oil Judgment, and the Williams litigation—the Disclosure Statement does not provide projections or other information regarding the collectability of these causes of action.

     **J.**     **Financial Information, Data, Valuations or Projections Relevant to the Creditors' Decision to Accept or Reject the Chapter 11 Plan**

     28.     The information in the Disclosure Statement is woefully inadequate with respect to providing the creditors with the financial information necessary to fully analyze whether the Debtor's reorganization or liquidation would provide a better outcome.  For example, the Debtor provides no explanation or basis for is projected 2018 and 2019 revenue in Exhibit C to the Disclosure Statement.  This revenue appears to be in spite of repairs and certifications needed for the D/B WILLIAM KALLOP and the fact that it will be—at the very least—March 1, 2018 before the Debtor will be in a position to bid for decommissioning contracts.

     29.     Second, there is no analysis of how the Debtor intends to pay off the Exit Financing or the Working Capital Loan that are contemplated under the Plan Sponsor Commitment.  Additionally, the Debtor does not indicate what fees and expenses it will have reimburse the Plan Sponsor for, even though the Plan Sponsor Commitment states that the Debtor will be responsible for such reimbursements for both the Exit Financing and the Working Capital Loan.  The terms of the Exit Financing—18 months repayment at 15% interest—are not included in the Exhibit C financial projections for 2018 and 2019.

30. The Plan Sponsor Commitment, which forms the basis of the Plan, fails to identify material items such as, the terms of the Working Capital Loan, the conditions to closing the Exit Financing (which is directly related to the determination of the effective date and, as such, the earliest possible date on which the unsecured creditors will be paid).

31. The Disclosure Statement fails to explain the impact of "post-effective date" treatment for disputed lien claims and disputed unsecured claims. This will be paid out of Working Capital, which will decrease the amount of capital available to the Debtor to restart its operations.

32. The Disclosure Statement details the market conditions that led the Debtor to file for bankruptcy protection (i.e. general downturn in the energy market) but fails to provide any discussion on how those same market conditions have turned around in less than a year such that the Debtor not only can secure $16.9 million in financing, but also project $18 million in revenue for 2018 and 2019.

33. Finally, the Disclosure Statement indicates that the Debtor will have about $17 million in cash on the effective date, less amounts that it has paid to secured claimants. In reality, based on the Court's prior orders, the Debtor will have $10 million in cash on the effective date with which to pay claims. Of that $10 million, approximately $3.2 million will be used to pay off the debtor in possession financing. Another unknown amount will be reserved to pay professional fees (with any surplus returned to the Reorganized Debtor and not used to pay unsecured claims), and an unknown amount to pay the Plan Sponsor's professionals' fees and other expenses. Given the Debtor's continued understatement of unsecured claims, there is little possibility that the unsecured claims will be paid in full in this case (and if the Working Capital

Loan is used to make these payments, then the chances of the Debtor having sufficient funding to reorganize become slimmer).

### K. The Actual or Projected Realizable Value from Recovery of Preferential or Otherwise Voidable Transfers

34. The Disclosure Statement does not provide any information regarding the value of its preferential or voidable transfers, even though the Debtor seeks to release "any loans made by OSF to any of OSF's employees or other Representatives, or any such employees' or other Representatives' family members or trusts." The Debtor provides no analysis as to whether these transfers are true loans or have been characterized as loans for appearances in the Disclosure Statement and Plan.

### L. The Relationship of the Debtor with Affiliates

35. The Disclosure Statement is devoid of any explanation as to who the Debtor considers its affiliates to be. Importantly, the Plan defines "Affiliate" by simply referring to Bankruptcy Code section 101(2). *See* Plan Art. I.A.4. However, the Plan contemplates providing releases to "Releasees", which is broadly defined as "each of the Debtor, the Creditors' Committee, the Plan Sponsor, each of their respective Affiliates, and each of their and their respective Affiliates' current and former Representatives." *See* Plan Art. I.A.86. At no point does the Disclosure Statement provide adequate information with respect to which individuals or entities are being released by the Debtor—and purported by third-parties—under the Plan.

36. Further, the Disclosure Statement fails to identify which entities provided nearly $30 million in working capital loans to the Debtor in the year preceding the Petition Date. There is no information as to whether the Debtor's affiliates are classified as subordinated unsecured claims, Class C-2, or any detail as to the creditor filing a $25 million Class C-2 proof of claim

(and the claims register is currently devoid of any such proof of claim with the exception of Mr. Jackson's personal injury proof of claim). This information is critical to understanding why the Debtor was first unable to pay maritime lien claimants and later seeking Chapter 11 protection.

## **RESERVATION OF RIGHTS**

37. In addition to the objections asserted and relief requested herein, MARS expressly reserves all of its rights to assert additional objections to the Disclosure Statement, to any modification of the Disclosure Statement, and to any amended disclosure statement or modification of any subsequent plan, on any and all grounds, whether or not set forth herein, at the Confirmation Hearing.

## **CONCLUSION**

WHEREFORE, MARS hereby respectfully requests that this Court deny approval of the Disclosure Statement, and grant such other and further relief to which MARS is entitled, either at law or in equity.

DATED:  February 1, 2018

                                Respectfully Submitted:

                               */s/ Davis Lee Wright*
                               Gavin H. Guillot (TX Bar No. 24099123)
                               SDTX Federal ID No. 2236795
                               Elizabeth B. McIntosh (admitted *pro hac vice*)
                               Pusateri, Johnston, Guillot & Greenbaum
                               1100 Poydras Street, Suite 2250
                               New Orleans, LA 70163
                               Telephone: (504) 620-2500
                               Facsimile: (504) 620-2510
                               E-mail: Gavin.Guillot@pjgglaw.com

                                    - and -

                               Davis Lee Wright (DE Bar No. 4324)
                               SDTX Federal ID No. 3135104
                               Montgomery, McCracken, Walker & Rhoads, LLP
                               1105 N. Market Street, 15th Floor
                               Wilmington, DE 19801

Telephone: (302) 504-7800
Facsimile: (302) 504-7820
E-mail: dwright@mmwr.com

*Attorneys for Modern American Recycling Service, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 1st day of February, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System in the United States Bankruptcy Court for the Southern District of Texas.

_/s/ Davis Lee Wright_