IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 17-35623** |
| **OFFSHORE SPECIALTY** | § | |
| **FABRICATORS, LLC,** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF THE PLAN OF
LIQUIDATION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
OFFSHORE SPECIALTY FABRICATORS, LLC
<u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

Dated: September 10, 2018

Susan C. Mathews
Texas Bar No. 05060650
smathews@bakerdonelson.com
Daniel J. Ferretti
Texas Bar No. 24096066
dferretti@bakerdonelson.com
1301 McKinney St., Suite 3700
Houston, TX 77010
Telephone:  (713) 650-9700
Facsimile:  (713) 650-9701

-AND-

Jan M. Hayden
(Admitted Pro Hac Vice)
Louisiana Bar No. 6672
jhayden@bakerdonelson.com
Edward H. Arnold, III
Louisiana Bar No. 18767
Federal ID No. 17158
harnold@bakerdonelson.com
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-8645
Facsimile: (504) 585-6945

*Attorneys for Official Committee of Unsecured
Creditors for Offshore Specialty Fabricators,
LLC*

I

This Disclosure Statement is subject to final approval by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") and other customary conditions.  Acceptances or rejections of the *Plan of Liquidation of the Official Committee of Unsecured Creditors and Debtor Offshore Specialty Fabricators, LLC Under Chapter 11 of the Bankruptcy Code* (as the same may be amended or modified from time to time solely in accordance with the terms thereof, the "**Plan**"), a copy of which is attached to this Disclosure Statement as **Exhibit A**, will be solicited upon approval of this Disclosure Statement by the Bankruptcy Court. Such solicitation will only be made in compliance with applicable provisions of securities and/or bankruptcy laws.

A hearing on final approval of the Disclosure Statement will take place before the Bankruptcy Court on September 6, 2018 at 9:00 a.m. (prevailing Central Time).  Future developments relating to the matters described herein may require modifications, additions, or deletions to this Disclosure Statement.  This Disclosure Statement is not an offer to sell any securities and is not soliciting an offer to buy any securities.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

The Official Committee of Unsecured Creditors (the "Committee") is providing the information in this Disclosure Statement to holders of Claims for purposes of soliciting votes to accept or reject the Plan based largely upon information provided to it by the Debtor.[1]  Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purposes. Before deciding whether to vote for or against the Plan, each holder of a Claim entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Risk Factors described in Section XI herein.

**The Voting Deadline to accept or reject the Plan is 5:00 p.m. (prevailing Central Time) on October 11, 2018 (the "Voting Deadline").  To be counted, ballots indicating acceptance or rejection of the Plan must be actually received by Cynthia Lujano, the Proponent's notice, claims and balloting agent (the "Balloting Agent") no later than the Voting Deadline.**

The Creditors' Committee ("Proponent") urges you to read this Disclosure Statement carefully for a discussion of voting instructions, recovery information, classification and treatment of Claims and Member Interests, the history of the Debtor and the Chapter 11 Case, the Debtor's business, and summary of the Plan.  You should not construe the contents of this Disclosure Statement as providing any legal, business, financial or tax advice. Each holder of a Claim or Member Interest should  consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the proposed transactions contemplated thereby.  Furthermore, the Bankruptcy Court's approval of this Disclosure Statement, for purposes of permitting the Proponent to solicit votes in connection with the Plan, does not constitute the Bankruptcy Court's final approval of the Plan.

---

[1]   Capitalized terms used but not defined in this disclaimer shall have the meanings ascribed to them elsewhere in this Disclosure Statement or the Plan.

II

This Disclosure Statement contains only a summary of the Plan and certain other documents. It is not intended to replace a careful and detailed review and analysis of the Plan and other documents, but only to aid and supplement such review. This Disclosure Statement is qualified in its entirety by reference to the Plan and any exhibits to the Plan or the Disclosure Statement, and any supplement(s) to the Plan ("Plan Supplement") filed with the Bankruptcy Court subsequent to the filing date of this Disclosure Statement and the exhibits attached hereto and thereto and the agreements and documents described herein and therein. If there is a conflict between the Plan or the Plan Supplement and this Disclosure Statement, the provisions of the Plan or Plan Supplement, as applicable, will govern. You are encouraged to review the full text of the Plan and the Plan Supplement and to carefully read the entire Disclosure Statement, including all exhibits hereto, before deciding how to vote with respect to the Plan. The Proponent does not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Proponent relied on financial data derived from the Debtor's books and records and on various assumptions regarding the Debtor's business. While the Proponent believes that such financial information is likely the best evidenced of the financial condition of the Debtor as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made by any entity as to the accuracy of the financial information contained herein or assumptions regarding the Debtor's business and future results and operations. Except as specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles. The Proponent expressly cautions readers not to place undue reliance on any forward-looking statements contained herein.

The Proponent or any other authorized party may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims. As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement is not, and is in no event to be construed as, an admission, or stipulation of the Debtor or the Creditors Committee.

The Proponent is making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Proponent may subsequently update the information in this Disclosure Statement, the Proponent has no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. Holders of Claims reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion, modification or amendment. The Proponent reserves the right to file an amended or modified Plan and related Disclosure Statement from time to time.

The Proponent has not authorized any Entity to give any information about or concerning the Plan other than what is contained in this Disclosure Statement. The Proponent has not

III

authorized any representations concerning the Debtor or the value of its property other than as set forth in this Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims and Member Interests (including those holders of Claims who do not submit ballots to accept or reject the plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the restructuring transactions contemplated thereby.

There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).   You are encouraged to read the Plan and this Disclosure Statement in its entirety, including but not limited to Section XI titled "RISK FACTORS," prior to submitting your ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.

**THE PROPONENT URGES HOLDERS OF IMPAIRED CLAIMS IN CLASSES C-1, C-2, C-3 AND C-4 TO VOTE TO ACCEPT THE PLAN.**

4842-2245-2845 v6
2942535-000001

# TABLE OF CONTENTS

| | | | |
|---|---|---|---:|
| **I.** | **INTRODUCTION** | | 1 |
| | A. | Overview of Chapter 11 | 1 |
| | B. | Overview of the Plan. | 2 |
| **II.** | **OVERVIEW OF THE PLAN** | | 2 |
| | A. | General Basis for the Plan. | 2 |
| | B. | Administrative and Priority Claims. | 3 |
| | C. | Holders of Claims Entitled to Vote. | 4 |
| | D. | Acceptance of a Plan by a Class. | 5 |
| | E. | Summary of Classification and Treatment of Claims and Member Interests. | 6 |
| | F. | Classification and Treatment of Claims and Member Interests for | 7 |
| | | the Debtor. | 7 |
| | G. | Treatment of Claims and Member Interests for the Debtor. | 10 |
| | H. | Special Provision Governing Unimpaired Claims. | 14 |
| | I. | Nonconsensual Confirmation. | 14 |
| **III.** | **OVERVIEW OF THE DEBTOR'S BUSINESS AND CAPITAL STRUCTURE** | | 15 |
| | A. | Business Overview. | 15 |
| | B. | Intercompany Transactions. | 15 |
| | C. | Prepetition Claims. | 16 |
| **IV.** | **EVENTS LEADING TO THE CHAPTER 11 FILING** | | 17 |
| | A. | Market Conditions. | 17 |
| | B. | Arrest of the Barges by Creditors. | 17 |
| **V.** | **SIGNIFICANT EVENTS OF THE CHAPTER 11 CASE** | | 18 |
| | A. | "First Day" Relief Requested. | 18 |
| | B. | Other Significant Pleadings Filed Since the Petition Date. | 19 |
| | C. | Settlement with Affiliates and USSIC | 24 |
| | D. | Retention of Professionals. | 25 |
| | E. | Creditors' Committee. | 26 |
| | F. | Books and Records | 26 |
| **VI.** | **MEANS FOR IMPLEMENTATION OF THE PLAN** | | 26 |

i

# TABLE OF CONTENTS
(continued)

Page

**A.** Preservation of Causes of Action; Transfer of Assets; Establishment of Personal Injury Reserve ................................................................ 26

**B.** Establishment of Liquidating Trust and Authority, Rights and Duties of Liquidating Trustee. ................................................................ 27

**C.** Selection of Trust Oversight Committee. ....................................... 30

**D.** Operations of the Debtor Between the Confirmation Date and the Effective Date. ................................................................ 31

**E.** Establishment of the Administrative Claims Bar Date. .................... 31

**F.** Terms of Injunctions or Stays. ....................................................... 31

**G.** Creditors' Committee. .................................................................... 31

**H.** Debtor's and Creditors' Committee Professionals. ......................... 32

**VII.** ADDITIONAL PROVISIONS GOVERNING DISTRIBUTIONS .................... 32

**A.** Initial Distributions to Holders of Unsecured Claims....................... 32

**B.** Disputed Reserve. ......................................................................... 33

**C.** Subsequent Distributions. ............................................................. 33

**D.** Delivery of Distributions. ............................................................... 33

**E.** Manner of Cash Payments Under the Plan. .................................... 34

**F.** Time Bar to Cash Payments by Check. ........................................... 34

**G.** Compliance with Tax Requirements. .............................................. 34

**H.** No Payments of Fractional Dollars and Minimum Distributions. ...... 34

**I.** Interest on Claims. ......................................................................... 34

**J.** No Distribution in Excess of Allowed Amount of Claim.................... 35

**K.** Setoff and Recoupment. ................................................................ 35

**VIII.** DISPUTED CLAIMS ................................................................................ 35

**A.** No Distribution Pending Allowance. ............................................... 35

**B.** Resolution of Disputed Claims; Treatment of Subordinated Claims................. 35

**C.** Objection Deadline. ....................................................................... 36

**D.** Estimation of Claims. ..................................................................... 36

**IX.** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 36

**A.** Assumption and Rejection of Executory Contracts and Unexpired Leases. ....... 36

**B.** Claims Based on Rejection of Executory Contracts and Unexpired Leases. ...... 36

**C.** Cure Claims. ................................................................................. 37

ii

## TABLE OF CONTENTS
(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | **D.** | Insurance Policies. | 37 |
| **X.** | | INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS | 38 |
| | **A.** | Compromise and Settlement. | 38 |
| | **B.** | Releases. | 38 |
| | **C.** | Exculpation. | 40 |
| | **D.** | Injunction. | 41 |
| | **E.** | Release of Liens. | 42 |
| **XI.** | | RISK FACTORS | 42 |
| | **A.** | Certain Bankruptcy Law Considerations. | 42 |
| | **B.** | Risk Factors That May Affect Distributions Under The Plan. | 45 |
| **XII.** | | SOLICITATION AND VOTING PROCEDURES | 46 |
| | **A.** | Holders of Claims Entitled to Vote on the Plan. | 47 |
| | **B.** | Voting Record Date. | 47 |
| | **C.** | Voting on the Plan. | 47 |
| | **D.** | Ballots Not Counted. | 47 |
| **XIII.** | | CONFIRMATION OF THE PLAN | 48 |
| | **A.** | Requirements for Confirmation of the Plan. | 48 |
| | **B.** | Best Interests of Creditors/Liquidation Analysis. | 49 |
| | **C.** | Feasibility. | 49 |
| | **D.** | Acceptance by Impaired Classes. | 49 |
| | **E.** | Confirmation Without Acceptance by All Impaired Classes. | 50 |
| **XIV.** | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 51 |
| | **A.** | Federal Income Tax Consequences to the Debtor. | 52 |
| | **B.** | Federal Income Tax Consequences to Creditors/Beneficiaries. | 52 |
| | **C.** | Federal Income Tax Consequences to the Liquidating Trust. | 54 |
| | **D.** | Information Reporting and Backup Withholding. | 54 |
| | **E.** | Importance of Obtaining Professional Tax Assistance. | 55 |
| **XV.** | | CONCLUSION AND RECOMMENDATION | 55 |

4842-2245-2845 v6
2942535-000001

## EXHIBITS

| | |
|---|---|
| **EXHIBIT A** | **Plan of Liquidation** |
| **EXHIBIT B** | **Liquidation Analysis** |
| **EXHIBIT C-1** | **Statement of Affiliates with Respect to Claims** |
| **EXHIBIT C-2** | **Transfers from OSF to Affiliates** |
| **EXHIBIT D** | **Steve Williams Transfers** |
| **EXHIBIT E** | **Other Potential Avoidance Actions** |

**THE PROPONENT HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

iv

## I.      INTRODUCTION

The Creditors' Committee submits this First Amended Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Member Interests in the Debtor in connection with: (1) the solicitation of acceptances of the Plan filed by the Creditors' Committee with the Bankruptcy Court; and (2) the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), scheduled to commence on October 18, 2018 at 9:30 a.m. (prevailing Central Time).  **Unless otherwise indicated or defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.**

In addition, unless otherwise noted, a ballot for the acceptance or rejection of the Plan is enclosed with each copy of this Disclosure Statement that is submitted to the holders of Claims that are entitled to vote to accept or reject the Plan.

On [●], 2018, after notice and a hearing, the Bankruptcy Court entered an order (the "Disclosure Statement Order") [ECF No. [●]] approving this Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable hypothetical, reasonable persons typical of the Debtor's creditors and Member Interest holders to make an informed judgment regarding the Plan.  Further, the Court deemed this Disclosure Statement approved only for the purposes of soliciting votes on the Plan, provided no objections are received by the relevant objection deadline. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for filing objections to confirmation of the Plan.  Detailed instructions for voting to accept or reject the Plan accompany each ballot.  Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, any Plan Supplement, the exhibits attached to all of the foregoing documents, the agreements and documents described therein, the Disclosure Statement Order, and the instructions accompanying the ballot in their entirety, before voting on the Plan.  These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### A.      Overview of Chapter 11.

Chapter 11, the principal business reorganization chapter of the Bankruptcy Code, permits a debtor to reorganize or liquidate its business for the benefit of itself, its creditors, and ownership interest holders.  In addition to the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and ownership interest holders in the distribution of a debtor's assets.  The commencement of a Chapter 11 Case creates an estate comprised of all of the legal and equitable interests of the debtor as of the date the chapter 11 petition is filed.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case. A plan of reorganization and liquidation both set forth the means for satisfying claims against and ownership interests in a debtor. Confirmation of a plan by the Bankruptcy Court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, any creditor or ownership interest holder of a debtor, and any other person or entity subject to the terms and conditions of the plan. Subject to certain limited exceptions, the order approving confirmation of a plan of reorganization discharges a debtor from any debt, ownership interest, or other claim that arose prior to the date of confirmation of the plan and substitutes in place of such debts and other claims the obligations specified in the confirmed plan.

Unlike a plan of reorganization, confirmation of a plan of liquidation does not discharge the debtor. A plan of liquidation is a sub-type of a chapter 11 plan, pursuant to which a debtor sells or transfers all or substantially all of its assets and winds down all of its operations in an orderly fashion under the supervision of the Bankruptcy Court.

Certain holders of claims against, and sometimes Member Interests in, a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable claimant or holder of a Member Interest to make an informed judgment regarding the plan. The Debtor is submitting this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against the Debtor that are entitled to vote to accept or reject the Plan.

The Plan here contemplates that four classes of creditors—C-1 General Unsecured Claims, Class C-2 Affiliate Claims, Class C-3 Unsecured Personal Injury Claims, and Class C-4 USSIC Claims—will be impaired classes of claimants entitled to vote on the Plan. The creditors in all other classes under the Plan are not entitled to vote either because they are unimpaired or are deemed to reject the Plan.

### B.   Overview of the Plan.

The Plan contemplates the liquidation of the Debtor by (1) transferring assets in satisfaction of or to reserve for claims classified in Classes C-2, C-3, and C-4, which are materially different from general unsecured claims, and (2) transferring the remainder of the Debtor's assets to a liquidating trust. The liquidating trustee of the liquidating trust will liquidate the assets of OSF, evaluate and object to disputed claims, defend or settle unresolved personal injury claims, and ultimately distribute the proceeds of liquidation to allowed unsecured claims pro rata.

## II.   OVERVIEW OF THE PLAN

### A.   General Basis for the Plan.

The Plan contains a plan of liquidation for OSF. The transactions contemplated under the Plan (as set forth in the Plan and as described herein) allow OSF's assets to be liquidated in a

2

timely manner and distributions to be made to undisputed creditors, with a reserve established for disputed creditors and personal injury claimants.  The Plan will also resolve current disputes with affiliates and U.S. Specialty Insurance Company. In this way, the Proponent believes that the Plan is superior to a chapter 7 liquidation because it allows payments to be made to unsecured creditors sooner, with lower administrative costs.  The Proponent believes that liquidation under chapter 7 will be more costly to the estate for two reasons.  First, the compensation of a chapter 7 trustee is a statutory percentage based on the amount of assets distributed; however, the plan trustee would work on an hourly basis, which should result in lower cost.  Second, under the Plan, much of the administrative work related to the claims of Affiliates and USSIC will be settled; whereas in a Chapter 7 scenario, the trustee would likely need to file an adversary proceeding to subordinate the Affiliates' claims and to continue prosecution of the Creditors' Committee's pending objections to the Affiliates' claims and to USSIC's claims.

### B.    Administrative and Priority Claims.

### 1.    Administrative Claims.

The Liquidating Trustee shall pay each holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim, in Cash, (a) on the later of:  (i) five (5) Business Days after the Effective Date (or, if not then due, within five (5) Business Days after the date when such Allowed Administrative Claim is due in the ordinary course of business); (ii) if such Claim is Disputed and is Allowed after the Effective Date, on the date that is five (5) Business Days after such Claim is Allowed by a Final Order; and (iii) at such later date and upon such terms as may be agreed upon by a holder of an Allowed Administrative Claim and the Liquidating Trustee or (b) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided, however*, that Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date.

### 2.    Professional Compensation and Reimbursement Claims and the Professional Fee Reserve.

All Professionals employed by the Debtor or the Creditors' Committee in this Chapter 11 Case shall (i) provide to the Creditors' Committee, before the Effective Date, an estimate of their Accrued Professional Compensation through the Effective Date before the Effective Date, and (ii) file all requests for allowance of compensation and reimbursement of expenses pursuant to sections 328, 330 or 503(b) of the Bankruptcy Code for services performed and expenses incurred in this Chapter 11 Case through the Effective Date by no later than the Professional Fee Claim Bar Date.

On the Effective Date, the Liquidating Trustee shall establish and fund the Professional Fee Reserve in accordance with the estimates provided by the Professionals.  In the event of excess amounts remaining in the Professional Fee Reserve after all Allowed Claims of Professionals have been paid in full, such excess amounts shall be transferred to the Liquidating Trustee and become Liquidating Trust Assets.  The Debtor believes sufficient amounts have been reserved by the Debtor from cash on hand to satisfy those Claims when they become due.

The order confirming the Debtor's plan shall establish the date the Bankruptcy Court will hear and determine all applications for final allowances of compensation or reimbursement of expenses under sections 328, 330 or 503(b) of the Bankruptcy Code. Parties-in-interest shall have thirty (30) days from the Professional Fee Claim Bar Date to formally object to any such fee requests.

### 3.    Priority Claims.

The Liquidating Trustee shall pay each holder of an Allowed Priority Claim the full unpaid amount of such Allowed Priority Claim in Cash on the later of: (i) five (5) Business Days after the Effective Date; (ii) five (5) Business Days after the date such Allowed Priority Claim becomes Allowed; and (iii) the date such Allowed Priority Claim is payable under applicable non-bankruptcy law.

The Debtor has informed the Proponent that, based on the Debtor's books and records, the Debtor estimates that it will have $96,111.70 in unpaid Priority Claims as of the Effective Date. This amount is based on amounts that OSF owes employees as a result of the cancellation of a health insurance plan for its employees that was largely self insured. According to the Debtor's books and records, approximately $39,029.94 was withheld from employees' paychecks for the purpose of contributing to an employee health insurance plan. In the months leading up to OSF's bankruptcy, certain employees incurred medical claims. OSF was unable to pay those claims due to liquidity constraints. Medical providers sought to collect unpaid claims from the individual employees. Thus, despite having amounts withheld from their paychecks to pay for insurance, employees were subject to collection efforts. The Debtor has informed the Proponent that the total amount due to employees for unpaid medical expenses is $96,111.70. The Proponent is relying on the Debtor for this information.

In the interests of equity and fairness, and pursuant to 11 U.S.C. §§ 105 & 507(a)(5), the Proponent proposes to satisfy employees' medical claims in full in the amount of $96,111.70.

### 4.    General.

Allowed Administrative Claims (Class A-1) and Allowed Priority Claims (Class A-2) shall be paid in full. Allowed Claims for Accrued Professional Compensation shall be paid in full, immediately upon allowance, from the Professional Fee Reserve to the extent of such reserve and, if insufficient funds remain in the reserve, by the Liquidating Trustee from Available Cash.

### C.    Holders of Claims Entitled to Vote.

Under the Bankruptcy Code, only holders of allowed claims in impaired classes of claims that are not deemed to have accepted or rejected a proposed plan are entitled to vote to accept or reject a proposed chapter 11 plan.

A class is "impaired" under a plan unless, with respect to each claim or interest of such class, the plan:

4

- leaves unaltered the legal, equitable or contractual rights to which the holder of the claim or interest is entitled; or

- notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based on such claim or interest.

Classes of claims that are unimpaired under a chapter 11 plan are conclusively presumed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders will receive no recovery under a chapter 11 plan are deemed to have rejected the plan and are also not entitled to vote to accept or reject the plan.

**Which Classes of Claims are Entitled to Vote on the Plan?**

The following Classes of Claims are Entitled to Vote on the Plan:

> Class C-1 – General Unsecured Claims
> Class C-2 – Affiliate Claims
> Class C-3 – Unsecured Personal Injury Claims
> Class C-4 – USSIC Claim

**Which Classes of Claims and Member Interests are Not Entitled to Vote on the Plan?**

The following Classes of Claims and Member Interests are not Impaired and, therefore, holders of Claims in these classes are not entitled to vote and are deemed to accept the Plan:

> Class B-1 – Secured Taxing Authorities
> Class B-2 – Other Secured Claims

As a result, holders of Claims and Member Interests in the foregoing classes conclusively are presumed to have accepted the Plan and will not be entitled to vote to accept or reject the Plan. If the Proponent obtains a Bankruptcy Court Order designating other Classes of Claims as unimpaired, those classes will also not be entitled to vote to accept or reject the Plan.

The following Classes of Claims are deemed to have rejected the Plan because their claims are extinguished:

> Class D-1 – Member Interests in OSF

### D.    Acceptance of a Plan by a Class.

The Bankruptcy Code defines "acceptance" of a plan by a class of impaired Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than

5

one-half in number of the claims that cast ballots for acceptance or rejection of the plan. In the event that the Bankruptcy Court enters an order holding that any Class of Claims is unimpaired, each holder of an Allowed Claim in any such Class will be conclusively presumed to have accepted the Plan, and any votes to accept or reject the Plan submitted by holders of Claims in any such Class will be null, void, and have no effect.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtor reserves the right to amend the Plan, request confirmation of the Plan under section 1129(b) of the Bankruptcy Code, or both. Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of a plan by one or more impaired classes of claims through a procedure known as "cram-down."

Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. If a Class of Claims entitled to vote does not vote to accept the Plan, the Proponent will announce its determination on whether to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code prior to or at the Confirmation Hearing.

### E. Summary of Classification and Treatment of Claims and Member Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Proponent has not classified Administrative Claims or Priority Claims, as described in Article II of the Plan.

The following table classifies Claims against and Member Interests in the Debtor, collectively, for all purposes, including voting, confirmation, and distribution pursuant to the provisions of the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Member Interest to be classified in a particular Class only to the extent that the Claim or Member Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that such Claim or Member Interest or any portion thereof qualifies within the description of such different Class. A Claim or Member Interest is in a particular Class only to the extent that any such Claim or Member Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated under the Plan as a distinct Class for voting and distribution purposes.

U.S. Specialty Insurance Company and certain Affiliates of OSF objected to the Committee's initial Disclosure Statement and asserted that the Plan's classification scheme is both not allowed under applicable bankruptcy law and evidences bad faith by the Committee. The Committee believes its classification scheme is proper. The stated goal of the Committee in proposing the Plan is not only to maximize distributions to unsecured creditors, but also to pay distributions to those creditors earlier than would otherwise occur under a chapter 7 liquidation. The Committee believes that the most efficient way to achieve this goal is by separately

classifying the materially different claims of Affiliates, personal injury claimants, and USSIC from the claims of general unsecured creditors.

The personal injury claimants are unliquidated and further have rights to insurance proceeds that may be pursued independently of their rights against OSF. By allowing personal injury claimants to liquidate their claims and collect on third party insurance, the Plan will afford personal injury claimants the possibility of a full recovery from non-estate assets. Likewise, by setting up a separate reserve for these unliquidated claims, the Plan will allow for distributions to other creditors while personal injury claims are being litigated. As a result, the separate classification benefits creditors in both classes C-1 and C-3.

With respect to the claims of Affiliates, these claims are materially different from the claims of general unsecured creditors such that they should be separately classified. As discussed in more detail below, the Committee has objected to these claims and is seeking to have them reclassified as equity contributions. To the extent they are in the nature of equity contributions, these claims should not be classified together with trade creditors. Additionally, the claims of insiders do not count toward the satisfaction of Section 1129(a)(10) of the Bankruptcy Code, which requires that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." The Plan provides for the settlement of all causes of action related to these Affiliate Claims, which again allows for the Plan's confirmation to move forward, forgoes the need to incur significant litigation costs, and prevents a loss which would, admittedly, result in significant dilution of the creditors in Class C-1. As a result, this separate classification also benefits creditors in both Class C-1 and C-2.

For similar reasons, the Committee is justified in separately classifying the claims of U.S. Specialty Insurance Company ("USSIC"). The Committee has also objected to USSIC's claims on the basis that they are wholly contingent and therefore due to be disallowed. As part of the settlement with the Affiliates embodied in the Plan, the Affiliates will enter into a contract with a decommissioning contractor to decommission, plug and abandon the wells that relate to the performance bonds that form the basis of USSIC's claim. Thus, like the personal injury claimants, the Plan provides for USSIC's claim essentially to be satisfied outside of the bankruptcy context through the performance of the work necessary to release USSIC's bonds. And, like the Affiliates' claims, the Plan settles the Committee's objection to the claim by allowing USSIC a recovery at a fraction of the amount USSIC would be entitled if its claim was allowed in full. As a result, this separate classification also benefits creditors in both Class C-1 and C-4.

The Committee does note, however, that the bankruptcy court may not approve its classification scheme. If it does not, the Plan may not be confirmable.

**F.     Classification and Treatment of Claims and Member Interests for the Debtor.**

7

| **OSF** | | | |
|---|---|---|---|
| **Proposed Treatment of Classes of Creditors Under a Plan of Reorganization Assumes an Effective Date of November 1, 2018** | | | |
| | | | |
| **Class** | **Description of Class** | **Estimated Range of claims in Class** | **Proposed Treatment Under Plan** |
| | | | |
| **UNCLASSIFIED CLAIMS** | | | |
| | | | |
| A-1 | Administrative Claims | $375,000[1] | Paid in full |
| | | | |
| A-2 | Priority Claims | $96,111.70[2] | Paid in full |
| | | | |
| **SECURED CLAIMS** | | | |
| | | | |
| B-1 | Secured Taxing Authorities | $0 | Paid in full |
| | | | |
| B-2 | Secured Creditors with Liens Against Debtor's Non-Barge Assets | $0 | Paid in full |
| | | | |
| **UNSECURED CLAIMS** | | | |
| | | | |
| C-1 | General Unsecured Creditors | $7,600,000.00[3] | Paid pro rata on account of beneficial interests in the Liquidating Trust if and when allowed |
| | | | |

[1] The Debtor does not anticipate having any unpaid administrative claims on the effective date other than professional fees.  Accordingly, this amount is the estimated sum of estate professionals' 20% holdbacks plus unpaid professional fees for the month of October 2018.  This amount assumes that that 80% of all professional fees are paid through confirmation.

[2] This amount represents charges for medical expenses incurred in 2017 by OSF's employees.  OSF did not reimburse those expenses because its self-insured insurance plan was cancelled for non-payment.

[3] This is the Debtor's estimate of the total value of Class C-1 Claims that will ultimately be Allowed.  Among other things, this estimate takes into account (i) the objections lodged against certain claims for purposes of estimation; and (ii) a reconciliation of and comparison of Claims and the Debtor's books and records.

| C-2 | Affiliate Claims | $57,000,000.00 | Satisfied in full by agreement through the transfer of the following assets to the Affiliates: (1) $350,000 cash; (2) the receivable owed to the Debtor by JAB Energy Solutions II, LLC; (3) a 50% interest in the Montco Receivable; (4) any improvements and fixtures affixed to the buildings owned by the Debtor at the North Yard, Houma, Louisiana (the real estate at the North Yard is owned by affiliate Offshore Express, LLC); (5) a mutual release of claims, which would include Avoidance Actions provided on Exhibit C-2. |
| C-3 | Unsecured Personal Injury Claims | $425,000.00 | Upon liquidation of claims, paid in accordance with insurance policy or from the Personal Injury Reserve |
| C-4 | USSIC Claim | $14,826,053.00 | Satisfied in full by agreement through the payment of $400,000 in cash. |
| **MEMBER INTERESTS** | | | |
| D-1 | Holders of Member Interests | $0 | Member Interests will be extinguished. |

### 1.    Sources and Uses of Cash on the Effective Date.

On the effective date, the Debtor's available cash will be used to pay administrative expenses and satisfy certain payments to creditors in Classes C-2, C-3, and C-4 as described in the following chart:

9

| Cash on Effective Date | | | |
|---|---|---|---|
| **Use** | **Min Recovery** | **Mid Recovery** | **Max Recovery** |
| Cash on Hand | $ 3,100,000.00 | $ 3,200,000.00 | $ 3,300,000.00 |
| Less Ch. 11 Priority Claims & Administrative Expenses | $ (471,111.70) | $ (471,111.70) | $ (471,111.70) |
| Less Payment to Secured Claims | $ - | $ - | $ - |
| Less Payment to Class C-2 | $ (350,000.00) | $ (350,000.00) | $ (350,000.00) |
| Less Personal Injury Reserve (Class C-3) | $ (425,000.00) | $ (425,000.00) | $ (425,000.00) |
| Less Payment to Class C-4 | $ (400,000.00) | $ (400,000.00) | $ (400,000.00) |
| **Total Available Cash on Effective Date** | **$ 1,453,888.30** | **$ 1,553,888.30** | **$ 1,653,888.30** |

Please note the amount of proceeds available on the Effective Date of the Plan may not reflect the total amount of proceeds available for distribution to creditors. For a full description of the expected total liquidation proceeds available under the Plan, please see the liquidation analysis attached to this Disclosure Statement as Exhibit B.

### G.      Treatment of Claims and Member Interests for the Debtor.

#### 1.      Secured Claims of Taxing Authorities (Class B-1)

(a)      *Classification*:  Class B-1 consists of the Secured Claims of Taxing Authorities.

(b)      *Allowance*:  The Debtor or the Liquidating Trustee shall determine the Allowed Class B-1 Claims by agreement or by an order of the Bankruptcy Court.

(c)      *Treatment*:  Within five business days of the Effective Date, except to the extent that a holder of an Allowed Class B-1 Claim agrees to less favorable treatment, and except as otherwise set forth in Article V of the Plan, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Class B-1 Claim, the Liquidating Trustee shall pay each holder of an Allowed Class B-1 Secured Claim the full amount of its Allowed Class B-1 Secured Claim from the Liquidating Trust Assets.

(d)      *Voting*:  Class B-1 is unimpaired and, therefore, each holder of an Allowed Class B-1 Secured Claim will not be entitled to vote to accept or reject the Plan.

(e)      *Amount of Claim*:  Based on the Debtor's Schedule, the Debtor does not believe that any creditors hold Class B-1 Claims.

#### 2.      Other Secured Claims (Class B-2)

(a)      *Classification*:  Class B-2 consists of all Other Secured Claims.

10

(b)      *Allowance*:   The Debtor shall determine the Allowed Class B-2 Claims by agreement or by an order of the Bankruptcy Court.

(c)      *Treatment*:   Except to the extent that a holder of an Allowed Class B-2 Claim agrees to a different treatment, holders of Allowed Class B-2 Claims, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Class B-2 Claim, each holder of an Allowed Class B-2 Claim shall receive payment of its Allowed Class B-2 Secured Claim within five (5) business days of the Effective Date.

(d)      *Voting*:   Class B-2 is unimpaired and, therefore, each holder of an Allowed Class B-2 Claim will not be entitled to vote to accept or reject the Plan.

(e)      *Amount of Claim*:   Based on the Debtor's Schedule, the Debtor does not believe that any creditors hold Class B-2 Claims.

### 3.      General Unsecured Claims (Class C-1)

(a)      *Classification*:   Class C-1 consists of all General Unsecured Claims.   To the extent an objection is pending against a holder of a Class C-1 Claim on the Effective Date, no Distributions shall be made until the entire Claim has been Allowed.

(b)      *Allowance*:   The Liquidating Trustee shall determine Allowed Class C-1 Claims by agreement, by an order of the Bankruptcy Court, or as follows:

(i)      If the Debtor listed a Class C-1 Claim on its Schedule in an undisputed capacity, the holder of the Claim does not file a Proof of Claim and no party files an objection to the Claim, the Claim will be Allowed in the amount indicated on the Schedule.

(ii)      If the Debtor listed a Class C-1 Claim on its Schedule and the holder of the Claim files a Proof of Claim in an amount less than the amount of the Claim on the Schedule, the Claim will be Allowed in the amount indicated on the Proof of Claim.

(iii)      If the Debtor listed a Class C-1 Claim on its Schedule in an undisputed capacity and the holder of the Claim files a Proof of Claim in an amount higher than the amount of the Claim on the Schedule, the Proponent or the Liquidating Trustee shall file an objection to the allowance of such Claim.   The Claim will be finally Allowed in an amount to be determined by the Bankruptcy Court after the Liquidating Trustee has administered claims objections as provided in Article V of the Plan.

(iv)      If the Debtor did not list a Class C-1 Claim on its Schedule or listed a Class C-1 Claim as disputed, unliquidated, or contingent, and the holder of the Claim files a Proof of Claim, one of the Proponent or the Liquidating Trustee shall file an objection to the allowance of such Claim.   The Claim will be finally Allowed in an amount to be determined by the Bankruptcy Court after the Liquidating Trustee has administered claims objections as provided in Article V of the Plan.

4842-2245-2845 v6
2942535-000001

(c)      *Treatment*:  Except to the extent that a holder of an Allowed Class C-1 Claim agrees to a different treatment, each holder of an Allowed Class C-1 Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Class C-1 Claim, a pro rata share of the Liquidating Trust Beneficial Interests and shall be entitled to receive Distributions from the Liquidating Trust in accordance with Article IV of the Plan.

(d)      *Voting*:  Class C-1 is Impaired and, therefore, each holder of an Allowed Class C-1 Claim is entitled to vote to accept or reject the Plan.

(e)      *Amount of Claims*:  The Debtor's Schedule reflects that approximately $6,300,000 is owed to holders of Class C-1 Claims.  A more accurate estimate is $7,000,000.00 based on filed proofs of claim.

### 4.      Affiliate Claims (Class C-2)

(a)      *Classification*:  Class C-2 consists of all Affiliate Claims against OSF.

(b)      *Allowance*:  For purposes of voting and distribution, the Affiliate Claims shall be Allowed as filed in the Chapter 11 Case.

(c)      *Treatment*:  The holders of Allowed Affiliate Claims shall nominate an administrative agent to administer the assets received on account of the Allowed Affiliate Claims, and provide notice of the nomination of the administrative agent to the Debtor, the Liquidating Trustee, and counsel for the Creditors' Committee.  The nominated administrative agent for the Allowed Class C-2 Claims shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Class C-2 Claim, the following:

(i)      the aggregate amount of $350,000 in Cash, payable within five business days after the Effective Date by the Debtor from the Class C-2 Reserve;

(ii)      the JAB Receivable, pursuant to an assignment in substantially the form attached hereto as **Exhibit B-1**;

(iii)      a 50% interest in the Montco Receivable pursuant to an assignment in substantially the form attached hereto as **Exhibit B-2**; and

(iv)      all of OSF's right, title and interest in any improvements and fixtures affixed to the buildings located at the North Yard, Houma, Louisiana, pursuant to an assignment in the form attached hereto as **Exhibit B-3**.  For avoidance of doubt, "improvements" shall not include any personal property assets owned by OSF.

The foregoing assets will be paid or transferred by the Debtor to the nominated administrative agent for the Allowed Class C-2 Claims within five business days after the Effective Date.  In addition to the foregoing, on the Effective Date, the Creditors' Committee and the Debtor, on behalf of itself, the Estate, and their successors and assigns, including the Liquidating Trustee

(collectively, the "First Parties") and the Insider Released Parties mutually release all Claims against one another as specifically set forth in Article VIII of the Plan.  Upon the Effective Date, the Creditors' Committee's objections [Docket Nos. 660-664] to the Affiliate Claims will be deemed withdrawn.

(d)     *Voting*:  Class C-2 is Impaired and, therefore, each holder of an Allowed Class C-2 Claim is entitled to vote to accept or reject the Plan.

(e)     *Amount of Claim*:  The filed proofs of claim related to Class C-2 Claims are approximately $57,000,000.

### 5.     *Unsecured Personal Injury Claims (Class C-3)*

(a)     *Classification*:  Class C-3 consists of all Personal Injury Claims that are not Personal Injury Lien Claims and that have not been previously settled with the Debtor, with such settlement being approved by the Bankruptcy Court and fully implemented by the parties prior to the Effective Date.

(b)     *Allowance*:  Either the Proponent or the Liquidating Trustee shall file objections to all Class C-3 Claims such that these claims are Disputed.  The Claims will be finally Allowed in an amount to be determined by the Bankruptcy Court after the Liquidating Trustee has litigated or settled such Claims as provided in Article IV of the Plan.

(c)     *Treatment*:  Except to the extent that a holder of an Allowed Class C-3 Claim agrees to a different treatment, each holder of a Class C-3 Claim will be allowed to pursue the following as he sees fit: (i) a direct action against the applicable insurer; and/or (ii) an action in which the holder of a Class C-3 Claim asserts claims against the Debtor solely for the purpose of liquidating the amount of the Claim against the Debtor and in which recovery is limited as provided in Article IV.B.7(b) below. In either case, each holder of a Class C-3 Claim shall be entitled to receive payment of his Allowed Personal Injury Claim from the proceeds of the applicable P&I Policy in accordance with the terms of such P&I Policy.  To the extent that it is determined that the Debtor is liable to any holder of such a claim, each holder of Allowed Class C-3 Claims shall receive a Pro Rata share of the Personal Injury Reserve, solely to the extent that such claim is not paid out of insurance proceeds, and shall be entitled to receive Distributions from the Personal Injury Reserve in accordance with Articles IV and V below.

(d)     *Estimation for Purposes of Personal Injury Reserve*:  Personal Injury Claims shall be Estimated for purposes of the Personal Injury Reserve in the amounts provided in Article IV.A.3. of the Plan, which is the applicable per-claim deductible under the applicable P&I Policy.

(e)     *Voting*:  Class C-3 is Impaired and, therefore, each holder of an Allowed Class C-3 Claim is entitled to vote to accept or reject the Plan.

(f)     *Amount of Claim*:  At this time, the amount of Claims in Class C-3 is unknown.  If limited to the deductible for the applicable P&I Policy, the amount of such Claims, excluding any late-filed or unfiled claims, would equal $225,000.00.

13

6. *USSIC Claim (Class C-4)*

(a) *Classification*:  Class C-4 consists of the USSIC Claim.

(b) *Allowance*:  For purposes of voting and distribution, the USSIC Claim shall be Allowed as filed in the Chapter 11 Case.

(c) *Treatment*:  The holder of the Allowed Class C-4 Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Allowed Class C-4 Claim, the aggregate amount of $400,000.00, payable no later than five business days after the Effective Date by the Debtor from the Class C-4 Reserve.  USSIC shall apply these funds first to pay the outstanding bond premiums, if any, for the bonds giving rise to the USSIC Claim.  Upon the Effective Date, the Creditors' Committee's objection [Docket No. 529] to the USSIC Claim will be deemed withdrawn.

(d) *Voting*:  Class C-4 is Impaired and, therefore, the holder of the Allowed Class C-4 Claim is entitled to vote to accept or reject the Plan.

(e) *Amount of Claim*:  The filed proof of claim related to the USSIC Claim equals $14,826,053.00.

7. **Member Interests in OSF (Class D-1)**

(a) *Classification:* Class D-1 consists of Member Interests in OSF.

(b) *Treatment:*  All existing Member Interests in OSF shall be cancelled on the Effective Date.  Each holder of Member Interests in OSF shall neither receive nor retain any property or interest in property on account of such Interest and such holder shall have no Claim against the Debtor, the Liquidating Trust or otherwise on account of such cancelled Member Interest.

(c) *Voting:* Class D-1 is deemed to have rejected the Plan unless the holder of such interests votes in the affirmative to accept the treatment under the Plan.

H.  **Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

I.  **Nonconsensual Confirmation.**

The Debtor reserves the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code.  To the extent that any Class votes to reject the Plan, the Proponent further reserves the right to modify the Plan in accordance with Article X.C. of the Plan.

14

### III.   OVERVIEW OF THE DEBTOR'S BUSINESS AND CAPITAL STRUCTURE

#### A.   Business Overview.

Founded in 1986, OSF installed and decommissioned offshore platforms in the Gulf of Mexico.  The Company maintained a barge slip and facility on the Houma Navigational Canal with 2,000 tons of load-out capacity and 80,000 square feet of fabrication and staging areas.

OSF owned or operated the two largest derrick barges currently operating in the Gulf of Mexico as of the Petition Date, the DB SWING THOMPSON IMO No. 7706005, outfitted with a 1200 metric ton crane; and the DB WILLIAM KALLOP IMO No. 8639455, which has a crane with a 1600 metric ton capacity.  As of the Petition Date, OSF had approximately thirty (30) employees, including management, land-based support, mariners, administrative and back-office personnel.

Traditionally, as a general contractor, OSF utilized the services of hundreds of vendors and subcontractors throughout the Gulf of Mexico for an array of oil and gas offshore projects. The company mainly serviced major offshore producers through the installation and dismantling of offshore platforms, load-outs, off-loads, and heavy single or dual barge lifts.

OSF also provided, either directly or through its vendors, highly qualified and industry-proven oilfield personnel, including project management professionals, professional engineers, project coordinators, petroleum engineers, mechanical engineers, structural engineers, naval architects, drafters, well site managers, clerks, safety representatives, medics, safety and environmental management (SEMS) coordinators, SEMS auditors, logistics coordinators and dock dispatchers.

OSF's relationships with its vendors and subcontractors were generally governed by certain joint master service contracts (the "MSCs") among OSF and the respective subcontractor(s).

While the MSCs provided a general framework for a working relationship with subcontractors, the day-to-day operations, scope of work, and pricing of projects were governed by individualized vendor work orders.  The balance of the working relationship between subcontractors and the Company continued pursuant to the terms and conditions of the work orders, as well as communications and invoices delivered between the Company and its respective subcontractors.

OSF managed each project from start to finish, including:  determining the necessary size of a required vessel(s); crafting schematics and procedures; pre-job meetings with the client and select vendors; mobilization and equipment requirements; and on-location clerks for purposes of providing daily reporting.

#### B.   Intercompany Transactions.

The Debtor asserted initially that due to the nature of OSF's general contracting business model, and the need to pay subcontractors and vendors in advance of receiving payment on

customer invoices, Affiliates of OSF had historically provided working capital funds, on an as-needed basis and in the form of intercompany loans, to OSF. OSF would then historically reimburse Affiliates for these advances upon receipt of customer payments. The Proponent and the holders of Class C-2 Claims dispute the nature of those cash advances. Affiliates filed claims against OSF's estate exceeding $57 million of unsecured debt, to which the Proponent has objected.

Furthermore, the Proponent believes that certain transfers from OSF to the Affiliates may be recoverable as preferential or fraudulent transfers. OSF's books and records indicate that Affiliates directly received approximately $8.834 million from OSF during the period from January 1, 2015 through the Petition Date, $2.865 million of which came during the year leading up to the Petition Date. A summary of the transfers from OSF to the Affiliates is attached here to as **Exhibit C**. OSF incurred substantial losses every year for at least the past five (5) years totaling over $34 million in the aggregate, and the Affiliates supported the company by lending funds to OSF to cover operating expenses in amounts that exceed the transfers from OSF to the Affiliates.

Additionally, the Proponent believes that the estate may have causes of action against certain Affiliates for contribution based on the amounts that OSF has paid (or may in the future pay) to satisfy the personal injury claim of Richard Jackson and the disputed, contingent, unsecured claim of U.S. Specialty Insurance Company ("USSIC"). Further discussion of the Jackson claim can be found in Section V.B.4. below. Offshore Express, LLC, one of the Affiliates, was a co-defendant, as well as an insured party on the same insurance policy, as OSF. Further discussion of the USSIC claim is found in Section III.C., immediately below.

As part of the settlement described in Section V.C. below and in Exhibit C-1 attached hereto, the Proponent, OSF, USSIC, and the Affiliates have agreed to settle any dispute regarding the allowance of the Affiliates' claims, USSIC's claims, and any causes of action that OSF may have against the Affiliates. The settlement would result in the release of any potential causes of action against the Affiliates noted above.

### C. Prepetition Claims.

In the ordinary course of its business, OSF routinely transacted business with a number of third-party contractors and vendors who could have asserted liens, including certain maritime liens, against OSF and its assets, including the Barges, in the event OSF failed to make timely payments for goods delivered or services rendered. As of the Petition Date, OSF estimates that approximately $14.5 million was due and owing to holders of prepetition trade claims against OSF (excluding the Intercompany Claims described above and Personal Injury Claims). Approximately half of these Claims were paid in connection with the sale of the Barges, as discussed below.

USSIC filed an approximately $14.8 million claim against OSF. This claim was not scheduled by OSF. The claim relates to an Indemnity Agreement whereby USSIC agreed to issue surety bonds on behalf of OSF's Affiliates, with OSF serving as an "additional principal." The Committee has asserted that OSF is essentially a guarantor of the Affiliates' obligations. USSIC disputes the Committee's characterization of its claim and asserts that OSF is directly

16

liable for the full amount of the surety bonds.  USSIC did issue a $100,000 customs bond for OSF's benefit, which OSF is currently seeking authority to cancel; however, the remainder of the bonds backstops obligations of Affiliates.  The Committee has objected to USSIC's claim [ECF 529] and requested that the Court estimate the claim at $0.00.  USSIC filed a response to that objection [ECF 642].  The treatment of USSIC's claim, and resolution of the Committee's objection, is part of the settlement described in Section V.C., below.

## IV.    EVENTS LEADING TO THE CHAPTER 11 FILING

### A.    Market Conditions.

With the downturn in the oil and gas industry and the sustained decrease in commodity prices from the beginning of the second half of 2014 through early 2016, companies across the industry faced severe pressures including reduced revenue streams, earnings and cash flows, as well as increasing difficulties to meet certain creditor obligations.  Operators in the industry, including OSF's customers, substantially reduced their existing production and implemented severe cutbacks in capital spending.  These market conditions have impacted oil and gas companies at every level, as many companies in the industry have filed for bankruptcy protection since the beginning of 2015.

Moreover, and as specifically related to the Debtor' business, oil and gas companies have substantially deferred decommissioning projects in order to conserve cash during the downturn leading to a decrease in demand for the Debtor's services.  The financial impact has vastly deferred or impeded the available work to the Debtor, as operators continued to curtail their decommissioning obligations.

### B.    Arrest of the Barges by Creditors.

Given OSF's liquidity constraints as a result of mismanagement by Steve Williams and certain other management brought in to run the company in 2015 and 2016, OSF was unable to pay several of its subcontractors and vendors over the course of 2016 and 2017.  As a result, certain creditors commenced actions in Louisiana to arrest the Barges starting in April of 2017.  At the same time, Steve Williams and his affiliated companies profited handsomely off of OSF by receiving payments exceeding $3.9 million during his time as CEO.  A listing of transfers to Steve Williams and his affiliated companies is attached hereto as **Exhibit D**.

As of the Petition Date, OSF had invoiced but not received payment from Montco Oilfield Contractors, Inc. ("MOC") for approximately $10,000,000 of subcontracted work.  In 2016, MOC had originally contracted with Black Elk Energy Offshore Operations, LLC ("Black Elk") to perform certain decommissioning, plugging and abandonment work for Black Elk's offshore oil and gas properties in accordance with federal regulations.

To complete that work, MOC needed the Barges.  MOC and OSF (then headed by Steve Williams) entered into a June 2, 2016 Master Time Charter Agreement (the "Time Charter") making the Barges available for MOC's use on the Black Elk contract.  Although OSF fulfilled its obligations under the Time Charter, MOC fell into financial trouble and filed for bankruptcy, leaving OSF's invoices unpaid.

17

As a result of MOC's failure to pay OSF, OSF was unable to satisfy the payments demands from its own creditors.  Beginning in 2016, certain creditors brought actions seeking to have the Barges arrested or attached to satisfy the amounts they were allegedly owed.  One of those creditors was Alliance Special Ventures Funds, LLC ("Alliance SVF"), which filed an action on March 15, 2017 styled *Alliance Special Ventures Funds, LLC v. William Kallop DB, et al*, C.A. No. 2:17-cv-02179-SM-MBN in the United States District Court for the Eastern District of Louisiana (the "Alliance Action").  The CEO of Alliance SVF is Steve Williams.

The Alliance Action primarily arises from Alliance SVF's March 3, 2017 purchase of certain obligations OSF owed to Rouse's Enterprises LLC ("Rouse's") for $130,000.00.  The Alliance Action alleges that (i) through November 17, 2016, Rouse's invoiced OSF for $108,158.89 for supplies and victuals provided to the DB WILLIAM KALLOP and (ii) through November 8, 2016, Rouse's invoiced OSF for $49,158.89 for supplies and victuals provided to the DB SWING THOMPSON.  OSF allegedly failed to pay for these goods.  The Alliance Action alleges that in 2016, pursuant to a Master Time Charter Agreement dated June 14, 2016, Alliance Energy Services, LLC ("Alliance ES") provided support vessels, including crew boats and supply vessels, to OSF in support of its operations, and to transport supplies and personnel to and from the DB WILLIAM KALLOP for which Alliance invoiced OSF $6,780.00 on October 6, 2016 and $47,550.00 on October 14, 2016. On March 7, 2017, Alliance ES assigned all of its rights and title to the Alliance ES invoices to Alliance SVF for $44,500.00.

Other creditors filed their own arrest actions or intervened in those filed by Alliance SVF and other creditors.  Including the Alliance Action, at least five lawsuits were file seeking to arrest one or both Barges.  The bulk of these actions were consolidated into Case No. 17-1595, *DeepCor Marine, Inc. v. Montco, Inc. et al.*, also pending before the United States District Court for the Eastern District of Louisiana.  In that action, an auction of the Barges subject to minimum bids was held at which no bids were made.  A second auction was scheduled for October 2, 2017.  The second auction was cancelled in light of the Debtor's filing its Chapter 11 Case.

## V.   SIGNIFICANT EVENTS OF THE CHAPTER 11 CASE

On October 1, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its properties as a Debtor in Possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A.   "First Day" Relief Requested.

#### 1.   Debtor in Possession ("DIP") Financing

On October 22, 2017, the Debtor filed its *Emergency Motion for Entry of Interim And Final Orders (I) Authorizing Debtor to Obtain Financing Pursuant to 11 U.S.C. §§ 105, 362, 364(c), 364(d) And 364(e); (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002 and 4001; and (III) Granting Related Relief* [ECF No. 53] (the "Interim Emergency DIP Motion"), seeking authorization to borrow up to $3 million from Schumann/Steier Holdings,

18

LLC (the "<u>DIP Lender</u>") to afford the Debtor sufficient liquidity at the outset of its Chapter 11 Case to operate its business and provide additional time either to liquidate its assets or negotiate a larger financing facility for the bankruptcy cases. The Bankruptcy Court entered an interim order approving the Interim Emergency DIP Motion on October 24, 2017 (the "<u>First Interim Emergency DIP Order</u>") [Docket No. 65].

The Bankruptcy Court further entered an *Agreed Order Granting Emergency Motion for Entry of Interim Order (I) Authorizing the Debtor to (A) Obtain Financing Pursuant to 11 U.S.C. §§ 105, 362, 364(c) and 364(e); (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002 and 4001; and (III) Granting Related Relief* [ECF No. 99] (the "<u>Second Interim Order</u>") as well as an *Agreed Third Interim Order Granting Emergency Motion for Entry of Interim Order (I) Authorizing the Debtor to (A) Obtain Financing Pursuant to 11 U.S.C. §§ 105, 362, 364(c) and 364(e); (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002 and 4001; and (III) Granting Related Relief* [ECF No. 143] (the "<u>Third Interim Order</u>").

After a final hearing on December 4, 2017, the Debtor and the DIP Lender agreed to an *Agreed Final Order Granting Emergency Motion For Entry of Order Authorizing Debtor to Obtain Financing Pursuant to 11 U.S.C. 105, 362, 364(c) and 364(e)* [ECF No. 291] (the "<u>Final Order</u>"). The Court entered the Final Order on January 8, 2018 [ECF No. 317].

The Debtor's credit facility with the DIP Lender has been paid in full.

### 2.     Insurance Motion

On the Petition Date, the Debtor was negotiating the payment of premiums for "protection and indemnity" ("<u>P&I</u>") insurance with the American Club. Given the Debtor's liquidity constraints, the Debtor needed to obtain post-petition financing and confirm a payment plan in order to maintain adequate insurance.

At a status conference on October 11, 2017, the Court indicated that the Debtor had to make arrangement for maintaining insurance coverage by October 18, 2017 at 9:00 a.m. The Debtor did so, though it still required financing to satisfy the remaining installment payments. The Court held a further status conference on insurance matters on October 24, 2017 at 2:00 p.m. By that time, the Debtor had finalized its financing arrangement with the DIP Lender.

The Debtor maintained necessary insurance coverages for the Barges.

### B.     Other Significant Pleadings Filed Since the Petition Date.

### 1.     Crosby Motion to Dismiss Case and Transfer Venue

On October 4, 2017, Crosby Tugs, LLC, one of the Debtor's creditors, filed a *Motion To Dismiss Debtor's Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b) or Terminate the Automatic Stay for Cause Pursuant to 11 U.S.C. § 362(d) or, Alternatively, Dismiss the Bankruptcy Case or Transfer Venue Pursuant to Bankruptcy Rule 1014* [ECF Nos. 14, 15 & 17] (the "<u>Motion to Dismiss</u>").

Other creditors including Versabar, Inc., MARMAC, LLC, and Fugro USA Marine, Inc., joined Crosby's Motion to Dismiss. At the Court's October 18, 2017 status conference, the Court directed Crosby to choose whether to first pursue its arguments related to dismissal for cause under section 1112(b) or its argument for transfer of venue. On October 19, 2017, Crosby elected to proceed with its arguments concerning dismissal for cause at the Court's October 24, 2017. ECF No. 49.

At that hearing, the Court heard evidence regarding the Motion to Dismiss. The Court granted the Debtor's motion for judgment on partial findings and denied the Motion to Dismiss. Crosby later elected not to proceed with the portion of its Motion to Dismiss related to transfer of venue. ECF No. 76.

### 2.     Motion to Establish Bidding Procedures for Barges

On October 23, 2017, the Debtor filed a *Motion for (A) Entry of an Order (i) Approving Bidding Procedures in Connection with the Sale of Debtor's Property, (ii) Scheduling Bidding Deadline, Auction Date and Sale Hearing Date, (iii) Approving Form and Notice Thereof and (iv) Approving Assumption and Assignment Procedures; and (B) Entry of an Order After the Sale Hearing (i) Authorizing the Debtor to Sell its Property, (ii) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases, and (iii) Granting Related Relief* [ECF No. 59] (the "Sale Procedures Motion").

The Debtor filed revised proposed sale procedures on November 9, 2017. ECF No. 98. After a hearing at which the Debtor and other parties-in-interest further refined the procedures, the Court issued an order granting the Sale Procedures Motion and authorizing an auction of the Barges [ECF No. 101] (the "Sale Procedures Order"). Among other things, the Sale Procedures Order set a bid deadline of January 15, 2018, and an auction date of January 19, 2018.

After the approval of the Sale Procedures, the Debtor's Chief Restructuring Officer, David Weinhoffer, pursued a vigorous marketing process for the Barges. Among other marketing efforts, he contacted maritime brokers seeking parties that may be interested in making bids, and arranged several inspections.

### 3.     Motion to Estimate Secured Claims against the Barges for Credit Bidding Purposes

During the Court's hearing on the Sale Procedures Order, questions arose concerning how parties could credit bid their secured claims against the Barges. The Court explained that any credit bid would also have to include a cash component sufficient to "cash-out" other creditors with equal-priority liens. In order to ascertain the rights of secured parties to credit bid at the auction, the Court required that secured claims be estimated.

On November 15, 2017, the Debtor, after consulting with the Creditors' Committee and secured creditors, filed a *Notice of December 5, 2017 Bar Date and Related Procedures for Parties Asserting Liens on the Derrick Barges William Kallop or Swing Thompson* [ECF No. 120]. The Notice required parties asserting claims secured by the Barges to file proofs of claim

20

by December 5, 2017.  Any party objecting to those proofs of claim had to file its objection on December 11, 2017.

The Court held an estimation hearing on December 11, 2017.  The majority of claims were estimated at that time, though the claims of DeepCor Marine and Mickel Hahn were subject to separate valuation hearings on December 28, 2017 and January 12, 2018, respectively.

The outcome of these estimation hearings is detailed in the Credit Bidding Estimation Order [ECF No. 347].  The Credit Bidding Estimation Order also amended the Bidding Procedures to provide potential bidders with the option of taking the DB WILLIAM KALLOP subject to Hahn's Personal Injury Lien Claim.

### 4.     Dispute with Personal Injury Claimants

As of the Petition Date, OSF was a defendant in certain personal-injury lawsuits brought by former employees of the company.  On November 15, 2017, Mickel Hahn filed an emergency motion for relief from the automatic stay.  ECF No. 118.  Hahn argued that cause existed to lift the stay to permit him to continue prosecuting his lawsuit against OSF in Texas state court.

Another personal-injury claimant, Richard Jackson, joined in Hahn's request for relief from the automatic stay.  The Debtor opposed Hahn's request, citing provisions in its P&I policy with Steamship Mutual Underwriting Association Limited (the "P&I Club"), which required the Debtor to pay defense and other costs before seeking reimbursement from its insurer.  ECF No. 125.  Moreover, the Debtor argued that Hahn had waived his right to seek a maritime lien by prosecuting his claim in state court, which cannot give a maritime remedy.

The Court held an initial hearing on Hahn's motion on November 16, 2017, but continued the hearing until November 20, 2017.  At the November 20, 2017 hearing, Hahn, Jackson, and the Debtor announced that they had reached an agreement whereby the parties would mediate their claims and submit any mediated settlement proposal to the P&I Club.

At the Court's estimation hearing on December 15, 2017, the Court considered whether Hahn or Jackson had valid claims for maritime liens against the WILLIAM KALLOP.  The Court ultimately determined that Hahn did, but Jackson did not.

The Court scheduled a separate estimation hearing for Hahn's claim for January 12, 2018, after which the Court estimated Hahn's claim at approximately $1,229,000.00.  The P&I Club consented to the payment of this amount as part of a settlement agreement between OSF and Hahn approved by the Court on March 27, 2018 (ECF No. 570).  As part of this settlement, the P&I Club reimbursed OSF approximately $535,000.00.  This settlement has been fully implemented by the parties.

OSF, Jackson, the P&I Club, and the Creditors' Committee participated in a second mediation with Jackson on April 11, 2018.  This mediation resulted in a settlement with Jackson in the amount of $5,500,000.00, to be paid in two installments of $2,750,000.00, with the P&I Club agreeing to reimburse OSF under the applicable P&I Policy (less an approximately

$731,000.00 deductible) after each installment.  The Court has approved the settlement, which is currently being implemented by the parties.

A third personal injury claimant, Charles Armstrong, filed a proof of claim on February 3, 2018, asserting a secured claim against the WILLIAM KALLOP in an unliquidated amount. The Proponent disputed that the claim was valid and secured.  Armstrong filed a motion to allow his secured claim as timely filed.  The hearing on this motion was continued twice as the parties continued settlement talks, and was last set for hearing on May 30, 2018. That matter has been resolved by a consent order and Mr Armstrong's claim was allowed as a secured claim in the amount of $150,000 and paid from the proceeds of the sale of the WILLIAM KALLOP, consistent with the treatment of other secured creditors with liens on the Barges.

Another personal injury claimant, Ronald Havard, filed a proof of claim on February 5, 2018.  Havard also filed a motion for relief from automatic stay to allow him to pursue his unsecured personal-injury claims against the Debtor.  The Debtor agreed to lift the stay.  Havard's litigation against the Debtor is proceeding in Cause No. 2:14-cv-00824-MLCF-SS in the United States District Court in the Eastern District of Louisiana, *Ronald Havard v. Offshore Specialty Fabricators, LLC.*

### 5. Schedules and Statements

On October 16, 2017, the Debtor filed an *Emergency Motion for Extension of Time to File Schedules and Statements* [ECF No. 48].   The Debtor supplemented the motion on November 3, 2017.  ECF No. 77.  Pursuant to the Court's Order Granting Extension of Time to File Schedules and Statement [ECF No. 81], the Debtor's deadline to file their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") was November 7, 2017.  The Debtor filed its Schedules and Statements on November 7, 2017. The Debtor filed an amended Schedule E/F on August 10, 2018 to reflect the disputed Affiliate Claims and USSIC Claim [ECF No. 685].

### 6. Auction of Barges and Plan Sponsor Commitment

On or about January 5, 2018, the Debtor signed a Plan Sponsor Term Sheet with the Orinoco Natural Resources, LLC ("Orinoco") in support of the Debtor's reorganization.  In light of this development, on January 9, 2018, the Debtor filed a motion to cancel the auction set to take place on January 19, 2018, which was opposed by the Creditors' Committee and other creditors.  *See* ECF No. 318.  After holding a hearing, the Court declined to cancel the auction.

On January 18, 2018, Orinoco proposed an updated version of the Plan Sponsor Term Sheet.  To secure more time to evaluate the Plan Sponsor Term Sheet as well as the bids submitted for the Barge, the Debtor sought permission to postpone the auction until Monday, January 22, 2018.  *See* ECF No. 350.  The Court declined to postpone the auction, but further amended the Bidding Procedures to permit the Debtor and the Creditors' Committee to compare the results of the auction with competing proposals from the Plan Sponsor.

The Debtor proceeded to its planned auction of the Barges on January 19, 2018.  The highest bid received for the DB SWING THOMPSON was $7,000,000, while the highest bid for

22

the DB WILLIAM KALLOP was $7,300,000.  The Debtor informed bidders at the conclusion of the auction that the Debtor would compare these results to a competing proposal from the Plan Sponsor.

On January 20, 2018, the Debtor and Orinoco executed the Plan Sponsor Commitment, which provided for the $10,000,000 Exit Facility and up to $6,900,000 in working capital from the Working Capital Financing.  Further, the Plan Sponsor Commitment contemplated the use only of the DB WILLIAM KALLOP.

At the sale hearing on January 22, 2018, the Debtor informed the Court that it was proceeding with a sale of the DB SWING THOMPSON to the highest bidder at the auction but considered the Plan Sponsor Commitment to be superior to the $7,300,000 bid on the DB WILLIAM KALLOP.  The Court approved the sale of the DB SWING THOMPSON and the sale closed on or about February 9, 2018.  However, the Court set a further hearing on February 15, 2018 to consider whether the Debtor is permitted to proceed with the Plan Sponsor Commitment instead of the $7,300,000 bid on the DB WILLIAM KALLOP.  The high bidder for the DB WILLIAM KALLOP, Modern American Railroad Services, LLC ("MARS"), opposed the Debtor proceeding with the Plan Sponsor Commitment or the confirmation of the Plan.

Orinoco ultimately reneged on the Plan Sponsor Commitment, for which the Proponent is investigating whether it is feasible to bring a breach of contract action against Orinoco.  As a result, the DB WILLIAM KALLOP was sold to MARS, with the sale closing on or about March 6, 2018.  From the proceeds of the sales of the Barges, the Debtor satisfied Maritime Lien Secured Claims in the approximate amount of $6.8 million and the Personal Injury Lien Claim of Mickel Hahn in the approximate amount of $1.2 million, with the Debtor receiving a reimbursement of approximately $500,000 from the applicable P&I Policy.  The Debtor also satisfied the DIP Facility and no longer owes any amount to the DIP Lender.

## 7.    Sale of Other Assets

The Debtor negotiated the sale of its Menck pile driving equipment to Menck GmbH (the manufacturer of the equipment) for $200,000, which the Bankruptcy Court approved by order entered April 20, 2018 (ECF No. 591).  The Debtor also negotiated the sale of certain other tangible assets, including scrap and vehicles, to MARS for a sale price of $450,000, which the Bankruptcy Court approved by order entered April 23, 2018 (ECF No. 598).  Finally, the Debtor's scrapped accommodations module was auctioned for $177,500 less a 10% auctioneer's commission.  However, the buyer of the module, Davie Shoring, Inc., failed to take possession of the module and defaulted on its payment obligations to the Debtor.  The Debtor has communicated these facts to the Proponent, and the Proponent has preserved any causes of action the Debtor may have against Davie Shoring, Inc. as more fully described in Section VI.  . At the hearing on approval of the Disclosure Statement (held September 6, 2018), the Affiliates reserved the right to request that the release of OSF contained in Section VIII.B.2. of the Plan should be revised to exclude any claims or causes of action the Affiliates may have in the event the module is abandoned and remains on the Affiliates' property, and this reservation of rights was noted on the record.  Resolution of the abandonment issue is a condition precedent to the Effective Date of the Plan.

23

### 8. Settlement with MARS

MARS also filed a $1.4 million claim against OSF as a result of payments made to OSF in connection with a real property sale contract between OSF and MARS for property owned by an affiliate of OSF, Offshore Express, LLC. MARS alleged in the proof of claim and in separate state court litigation that Offshore Express, LLC and OSF breached the contract and was liable to MARS for damages. Separately, OSF filed a motion to reject a bill of sale in favor of MARS covering certain scrap (ECF No. 185).

OSF and MARS settled their disputes with respect to the proof of claim and the bill of sale, with the Court approving the settlement on March 12, 2018 (ECF No. 545). The settlement provided that OSF would assume the bill of sale, that Offshore Express, LLC would transfer the disputed real estate to MARS, and that MARS would withdraw its $1.4 million proof of claim.

### C. Settlement with Affiliates and USSIC

One of the most significant issues that developed in the Case after OSF completed the sale of the Barges was the treatment of USSIC and the Affiliates in a future chapter 11 plan. If their claims were allowed in full and treated as general unsecured claims, USSIC (at approximately $14.8 million) and the Affiliates (at approximately $57 million) would be entitled to the lion's share of the assets of the bankruptcy estate at the expense of the remainder of the creditor body (which holds approximately $7 million, excluding personal injury claims). The Proponent, however, believed that it had strong legal arguments that these claims should be disallowed and, as a result, filed objections to the claims. After initial discovery and negotiations among the parties, and with all sides facing the reality that the litigation necessary for a full airing of the issues before the bankruptcy court would be costly and time consuming. With a limited and diminishing pool of assets available, and with the Committee's stated preference to confirm a plan that allows for interim distributions to creditors in short order, the Committee, OSF, USSIC and the Affiliates reached a settlement.

The settlement is embodied in the plan treatment described in Section II.G. above. The settlement provides that upon confirmation of the Plan, OSF will transfer the following assets to the Affiliates in satisfaction of their claims in the aggregate:

- Cash in the amount of $350,000;
- The receivable owed to OSF by JAB Energy Solutions II, LLC, which is in the stated amount of approximately $4.5 million, but which is currently the subject of litigation in Cause No. 2016-48155, pending in the District Court for the 151st Judicial District of Harris County, Texas;
- a 50% interest in OSF's claim against MOC and Montco Offshore, Inc. in their jointly administered bankruptcy cases.
- The improvements owned by OSF at the North Yard, which have a book value according to OSF's schedules of approximately $800,000; however, these improvements are on land owned by affiliate Offshore Express, LLC, and from the Proponents' perspective do not have material value on their own.

24

The settlement also requires OSF, the Committee, and the Affiliates to enter into mutual releases of claims. As a result, the only claims the Affiliates will be able to assert are to the treatment described above under the Plan.  OSF, on behalf of its bankruptcy estate, and the Committee would be waiving any claims or causes of action either could assert against the Affiliates, including Avoidance Actions under Sections 547 and 548 of the Bankruptcy Code.  This waiver would be binding on the Liquidating Trustee and the Liquidating Trust established under the Plan.

In addition to the foregoing, the settlement also resolves the claims of USSIC and the Committee's objection to it.  As discussed above, USSIC's claim is closely tied to the actions and obligations of the Affiliates.  As part of the settlement, the Affiliates agreed to enter into a decommissioning contract to complete the approximately $6 million worth of work needed to decommission wells so that USSIC's bonds could be canceled.  Execution and delivery of this contract, in form and substance acceptable to USSIC, is a condition precedent to the effectiveness of the Plan.  As part of the settlement of UCCIC's claim, USSIC will also receive cash in the amount of $400,000.  This represents an approximately 3% recover on the full amount of USSIC's $14.8 million claim; but upon completion of the decommissioning contract at the Affiliates' cost, USSIC's exposure on the bonds should be significantly reduced if not totally eliminated.

The Liquidation Analysis on **Exhibit B** describes the percentage recoveries under the Plan as compared to the recovery under a chapter 7, which assumes that the chapter 7 trustee would litigate the allowability of the claims of the Affiliates and USSIC. The outcome of that litigation would significantly affect the expected recovery of the various classes of creditors, as noted therein.

### D.   Retention of Professionals.

The Debtor obtained approval for the retention of various professionals to assist in the Chapter 11 Case, as follows:

### 1.   Legal Counsel

On October 31, 2017, the Debtor filed its *Application to Employ Diamond McCarthy as General Counsel to the Debtor* [ECF No. 73].  The Court granted the application on November 28, 2017.  ECF No. 154.  On July 11, 2018, the ownership of the Debtor purportedly terminated Diamond McCarthy as counsel for the Debtor, as well as the Debtor's chief restructuring officer; however, after discussions with Committee counsel, their termination was rescinded.

On November 22, 2017, the Debtor filed its *Application to Employ Jackson Walker LLP as Special Counsel* [ECF No. 148] in order to represent the Debtor in matters relating to the Montco Oilfield Contractors bankruptcy.  The Court granted the application on December 19, 2017.  ECF No. 259.

4842-2245-2845 v6
2942535-000001

On November 29, 2017, the Debtor filed its *Application to Employ Koch & Schmidt as Special Counsel* [ECF No. 162] in order to assist the Debtor in estimating the claims of secured maritime creditors.  The Court granted the application on December 19, 2017.  ECF No. 259.

On March 19, 2018, the Debtor filed its *Application to Employ Phelps Dunbar LLP as Special Counsel, Nunc Pro Tunc to November 20, 2017* [ECF No. 552] in order to assist the Debtor in defending Personal Injury Claims.  The Court granted the application on July 20, 2017 [ECF No. 673].

### E.   Creditors' Committee.

On October 25, 2017, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee") [ECF No. 66].  On March 12, 2018, the U.S. Trustee reconstituted the Creditors' Committee after the resignation of one of its members [ECF No. 544].   The Creditors' Committee is currently composed of the following members:  Retif Oil & Fuel, LLC, Abrado, Inc., and Cannata's Supermarket d/b/a Affiliated Marine Supply.

On November 22, 2017, the Committee filed its *Application to Employ Baker Donelson as Counsel for the Official Committee of Unsecured Creditors* [ECF No. 147].   The Court granted the application on December 21, 2017.  ECF No. 267.

### F.   Books and Records

OSF maintained extensive physical records in addition to computerized records located on its servers.  The Debtor has backed-up the computerized records and moved the physical records that it believes would be most relevant to the Liquidating Trustee to a storage facility in Houston.  The remainder of the Debtor's physical records is stored in commercial buildings on the Debtor's yard in Houma, Louisiana.  Given the age and condition of the physical records in Houma, as well as the fact that they may contain personal identifying information, the Debtor believes that those physical records should be shredded.

## VI.   MEANS FOR IMPLEMENTATION OF THE PLAN

### A.   Preservation of Causes of Action; Transfer of Assets; Establishment of Personal Injury Reserve

Unless any Causes of Action against a person or entity are expressly waived, relinquished, exculpated, released, compromised, settled, assigned, and/or otherwise conveyed in the Plan or by Court order (such as Causes of Action against holders of Allowed Class C-2 Claims as provided above), OSF reserves any and all OSF Causes of Action, whether arising before or after the date the Chapter 11 Case was filed.  Such OSF Causes of Action include, without limitation (a) all Avoidance Actions, insider transfers described on **Exhibit D** of the Disclosure Statement, and other potential Avoidance Actions against non-insiders described on **Exhibit E** of the Disclosure Statement, (b) the Montco Receivable, (c) the JAB Receivable, (d) the Linder Judgment, (e) any and all Claims or Causes of Action that the Debtor may have or have a right to assert against Orinoco for any alleged breach of the Plan Sponsor Commitment, (f) any and all claims that OSF may have or have a right to assert against Davie Shoring, Inc.

26

relating to its default of its payment obligations as described in Section V.B.7. of the Disclosure Statement, (g) any and all OSF Causes of Action, whether arising before or after the date the Chapter 11 Case was filed, and related to the Personal Injury Claims or the P&I Policies, specifically including reimbursement claims against any insurers, and (h) any Causes of Action, in addition to Avoidance Actions, OSF may assert against current or former Insiders of OSF (other than the Insider Released Parties) related to misconduct of current or former officers, directors, members, or managers of OSF, including Steve Williams and any Entity owned or controlled (directly or indirectly) by him.

The Committee is not OSF and does not have the institutional knowledge of potential claims or causes of action that OSF may own but did not adequately disclose.  Therefore, nothing herein or in the Plan should be construed as a release of any Causes of Action that OSF may be entitled to assert, and the Committee's intent is to preserve all causes of action of OSF, to the fullest extent possible, and transfer the same to the Liquidating Trust.

On the Effective Date, the Debtor shall be deemed to have irrevocably transferred and assigned the Liquidating Trust Assets to the Liquidating Trustee, to hold in trust for the benefit of the holders of the Liquidating Trust Beneficial Interests pursuant to the terms of this Plan and the Liquidating Trust Agreement.  Except as otherwise provided by this Plan or the Liquidating Trust Agreement, upon the Effective Date, title to the Liquidating Trust Assets shall pass to the Liquidating Trust free and clear of all Claims and Interests, in accordance with Section 1141 of the Bankruptcy Code.

Within five business days after the Effective Date, the Liquidating Trustee will establish the Personal Injury Reserve in the total amount of $425,000.00.  The reserve is calculated based in part on the deductible under the applicable P&I Policy for each respective proof of claim that was timely filed.  The reserve also includes a general contingency reserve of $200,000 to account for any allowed late-filed claims and the Liquidating Trustee's expenses of litigating personal injury claims.

### B.  Establishment of Liquidating Trust and Authority, Rights and Duties of Liquidating Trustee.

#### 1.  Formation

On or before the Effective Date, the Liquidating Trust Agreement shall be executed by the Debtor and the Liquidating Trustee, and all other necessary steps shall be taken to establish the Liquidating Trust.  The Liquidating Trust Agreement will be filed with the Plan Supplement prior to the hearing to confirm the Plan.

#### 2.  Purpose of Liquidating Trust.

The Liquidating Trust shall be established for the general purposes of winding up the Debtor's business, pursuing OSF Causes of Action transferred to the Liquidating Trust, prosecuting and resolving objections to Disputed Claims against the Debtor that are payable

from Liquidating Trust Assets, and liquidating and distributing the Liquidating Trust Assets, with no objective to continue or engage in the pursuit of a trade or business.

### 3. Causes of Action to be Transferred to Liquidating Trust, including Fraudulent and Preferential Transfers.

All reserved Causes of Action (except those Causes of Action transferred to or for the benefit of holders of Allowed Class C-2 Claims) shall be Liquidating Trust Assets transferred to the Liquidating Trustee. The Liquidating Trustee, or its successors and assigns, shall be authorized and empowered as a representative of OSF and the Estate to institute, prosecute, settle, compromise, abandon or release all Causes of Action of the Debtor that the Estate transfers to the Liquidating Trust, including causes of action for fraudulent transfers pursuant to sections 544, 548 & 550 of the Bankruptcy Code and applicable state law and for preference pursuant to sections 547 & 550 of the Bankruptcy Code. Additionally, on the Effective Date, the Liquidating Trustee shall assume the prosecution of any objection, motion, adversary proceeding, or other proceeding in the Bankruptcy Court (other than those proceedings retained under Article IV.G. of the Plan) currently being prosecuted by the Committee and shall be substituted for the Committee as the applicable party in interest, without the need to file any motion to substitute or other similar document.

### 4. Selection of Liquidating Trustee.

On or before the Effective Date, the Creditors' Committee shall select the Liquidating Trustee. The Committee is considering selecting David Weinhoffer, the Debtor's Chief Restructuring Officer, as the Liquidating Trustee, at a rate of $300 per hour, with a CPA/senior analyst billed at $175 per hour and a claims/case administrator billed at $100 per hour. Since the Plan contemplates that the litigation with Affiliates and USSIC and the claims analysis would be substantially completed by the time the Plan is confirmed, Mr. Weinhoffer believes that his duties would be part time and is estimated at $48,000 per year, with completion in approximately 2.5 years.

### 5. Authority of Liquidating Trustee.

Subject only to the limitations contained in this Plan or in the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized and empowered to pursue and defend any Causes of Action, including without limitation Causes of Action related to the Personal Injury Claims and the P&I Policies to the extent necessary, as a representative of the Estate and shall have the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, including, without limitation, the right to: (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan; (ii) make Distributions to holders of Allowed Claims against OSF in accordance with this Plan; (iii) object to Disputed Claims filed against OSF and prosecute, settle or otherwise resolve such objections; (iv) object to, or defend against, Disputed Personal Injury Claims filed against OSF, whether in the Bankruptcy Court or in another court of competent jurisdiction, and prosecute, settle or otherwise resolve such objections or other actions; (v) establish and administer any reserves for Disputed Claims or Personal Injury Claims that may be required; (vi) perform administrative services related to implementation of this Plan; (vii) file all

28

necessary tax returns and other filings with governmental authorities on behalf of the Liquidating Trust; and (viii) perform such other duties as are provided in the Plan and the Liquidating Trust Agreement.

### 6.   Oversight of Liquidating Trust.

The Trust Oversight Committee, which is described in more detail below, shall oversee the administration of the Liquidating Trust in accordance with the Liquidating Trust Agreement and consistent with the Plan.

### 7.   Claims Entitled to Distribution from the Liquidating Trust.

Except to the extent another provision of the Plan controls, the Liquidating Trustee, with oversight from the Trust Oversight Committee, shall be responsible for paying the following Claims (in the order of priority shown except as provided in paragraphs IV.B.7(b) and (c) of the Plan), from the Liquidating Trust Assets (except to the extent already satisfied): (i) Allowed Administrative Claims and Professional Compensation Claims, in the order of priority provided in the Bankruptcy Code, (ii) Allowed Priority Claims, (iii) Secured Claims of Taxing Authorities (iv) Allowed Other Secured Claims, (v) Allowed General Unsecured Claims, (vi) Allowed Personal Injury Claims according to Article IV.B.7. of the Plan, and (vi) Subordinated Claims.

The Liquidating Trustee, with oversight from the Trust Oversight Committee, shall be responsible for paying Personal Injury Claims from the Personal Injury Reserve, either (a) upon agreement among the Liquidating Trustee, the holder of an applicable Claim, and the applicable insurer (provided that any payment to be made from the Personal Injury Reserve does not exceed the applicable deductible absent a commitment by the applicable insurer to reimburse the Liquidating Trust), or (b) upon satisfaction of the following conditions: (i) the holder of the applicable Personal Injury Claim has obtained a final judgment liquidating the amount of his Claim; (ii) such holder has exhausted all remedies against the applicable insurer, and the insurer has either (1) paid the amount of such claim, less any applicable deductible, or (2) refused to pay such claim, and the holder has no further recourse against the insurer.

Notwithstanding the foregoing, all expenses of the Liquidating Trust shall be taxed against the gross proceeds of the Liquidating Trust and shall be satisfied prior to any Distributions on account of Claims.

### 8.   Compensation of the Liquidating Trustee

The Liquidating Trustee shall be entitled to reasonable compensation as set forth in the Liquidating Trust Agreement.

### 9.   Retention of Professionals

The Liquidating Trustee, with the consent of the Trust Oversight Committee, may retain and reasonably compensate counsel and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval.

4842-2245-2845 v6
2942535-000001

10.     **Dissolution of Liquidating Trust.**

Once all Liquidating Trust Assets have been liquidated and all Distributions required to be made by the Liquidating Trustee under the Plan have been made, the Liquidating Trust shall be dissolved and the Liquidating Trustee shall be discharged.  Notwithstanding the foregoing, in no event shall the term of the Liquidating Trust exceed five (5) years absent Bankruptcy Court approval.

11.     **Dissolution of OSF.**

The Liquidating Trustee shall have the right, in consultation with the Trust Oversight Committee, to dissolve OSF in accordance with applicable state law.

12.     **Indemnification of Liquidating Trustee.**

The Liquidating Trustee and the Liquidating Trustee's agents and professionals shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Liquidating Trustee, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trustee, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary due, or *ultra vires* acts. Any indemnification claim of the Liquidating Trustee, its agents or professionals, shall be satisfied from the Liquidating Trust Assets. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

C.     **Selection of Trust Oversight Committee.**

The Trust Oversight Committee shall have three members selected prior to the Effective Date as follows:  Each ballot shall include a statement soliciting membership in the Trust Oversight Committee and a place for creditors to mark whether or not they are interested in being a member of the Trust Oversight Committee.  After review of the creditors who indicated an interest in being a member of the Trust Oversight Committee, the existing members of the Creditors' Committee will select the members of the Trust Oversight Committee, subject to the review and approval of the Bankruptcy Court as being fair and equitable.  After the Effective Date, if a member of the Trust Oversight Committee has its claim paid in full or sells its entire claim, that member will resign from the Trust Oversight Committee and will be replaced by vote of the remaining members, provided, however, that the new member must be from the same Class as the resigning member, or a representative thereof, if creditors with outstanding claims remain in such Class.  A member of the Trust Oversight Committee shall not participate in decisions in which such member has a direct financial interest distinct from any other creditor of the same Class.  By way of example, if a settlement agreement between the Liquidating Trustee and a member with respect to the Allowance of that member's Claim requires the consent of the Trust Oversight Committee, that member shall not participate in the deliberation and decision of the Trust Oversight Committee with regard to such settlement.

4842-2245-2845 v6
2942535-000001

**D.      Operations of the Debtor Between the Confirmation Date and the Effective Date.**

The Debtor shall continue to operate as Debtor in Possession during the period from the Confirmation Date through the Effective Date.

**E.      Establishment of the Administrative Claims Bar Date.**

The Confirmation Order shall approve the Administrative Claims Bar Date.

Except as otherwise provided in this Article, on or before the Administrative Claims Bar Date, each holder of an Administrative Claim shall file with the Bankruptcy Court a request for payment of its Administrative Claim and serve a copy thereof so it is received substantially contemporaneous with the filing on counsel to the Liquidating Trustee and the Office of the United States Trustee for the Southern District of Texas.

The request for payment of an Administrative Claim will be timely filed only if it is actually received by the Bankruptcy Court, counsel to the Liquidating Trustee, and the Office of the United States Trustee for the Southern District of Texas by the Administrative Claims Bar Date.

Notwithstanding anything in this Article, Professionals shall not be required to file a request for fees and expenses arising under sections 328, 330, 331 or 503(b)(2)–(5) of the Bankruptcy Code, on or before the Administrative Claims Bar Date, as they will instead file final fee applications by the Professional Fee Claim Bar Date.

**F.      Terms of Injunctions or Stays.**

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Case is closed.

**G.      Creditors' Committee.**

Upon the Effective Date, the Creditors' Committee shall dissolve, and its members and Professionals shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case; provided; however, that the Creditors' Committee shall be deemed to continue to exist and have authority to act in this Chapter 11 Case, and its Professionals shall be deemed retained, after such date solely with respect to: (i) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code; (ii) review and, if appropriate, objections to any request for compensation or expense reimbursement filed by a Professional; (iii) seek reimbursement of expenses sought by a member of the Creditors' Committee; and (iv) defend against appeals of the Confirmation Order, if any.  The Liquidating Trustee shall pay the fees, costs and expenses of such Professionals incurred after the Effective Date, if the Bankruptcy Court approves such fees, costs and expenses.  Except for the foregoing proceedings for which the Committee retains authority, on the Effective Date, the Liquidating Trustee shall assume the prosecution of any objection, motion, adversary

31

proceeding, or other proceeding in the Bankruptcy Court currently being prosecuted by the Committee and shall be substituted for the Committee as the applicable party in interest, without the need to file any motion to substitute or other similar document.

### H. Debtor's and Creditors' Committee Professionals.

Upon the Effective Date, the Professionals employed by the Debtor and the Committee shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case; provided, however, that such Professionals shall be deemed retained after such date solely with respect to: (i) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code; (ii) motions seeking enforcement of the provisions of the Plan or the Confirmation Order; (iii) review and, if appropriate, objections to any request for compensation or expense reimbursement filed by a Professional; and (iv) defend against appeals of the Confirmation Order, if any. The Liquidating Trustee shall pay the fees, costs and expenses of such Professionals incurred after the Effective Date, if such fees, costs and expenses are approved by the Bankruptcy Court.

## VII. ADDITIONAL PROVISIONS GOVERNING DISTRIBUTIONS

### A. Initial Distributions to Holders of Unsecured Claims.

The Liquidating Trustee shall distribute Available Cash to Holders of Class C-1 Claims in accordance with the terms, treatment and priority provided in this Plan and the Liquidating Trust Agreement, beginning on the Initial Distribution Date or as soon as practicable thereafter, from the Liquidating Trust Assets in the Liquidating Trustee's possession (including any Cash received from the Debtor on the Effective Date), except such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed, prior to the time of such Distribution (but only until such Claim is resolved), (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during the administration of the Liquidating Trust, (iii) to pay reasonable expenses of the Liquidating Trust (including, but not limited to, any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets), and (iv) to satisfy other liabilities incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement (including without limitation any applicable reserves).

The Liquidating Trustee shall distribute amounts to Holders of Class C-3 Claims in accordance with the terms, treatment and priority provided in this Plan and the Liquidating Trust Agreement, beginning on the Initial Distribution Date or as soon as practicable thereafter, from the Personal Injury Reserve, except such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed, prior to the time of such Distribution (but only until such Claim is resolved), (ii) to pay reasonable expenses of the Liquidating Trust (including, but not limited to, any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets), and (iii) to satisfy other liabilities incurred by the Liquidating Trustee in objecting to or defending against the Disputed Personal Injury Claims.

4842-2245-2845 v6
2942535-000001

B.     **Disputed Reserve.**

Within five (5) business days after the Effective Date, the Liquidating Trustee shall establish and maintain a Disputed Reserve for Disputed Claims, in reasonable amounts as determined by the Liquidating Trustee in accordance with the Liquidating Trust Agreement and the provisions of the Plan.

C.     **Subsequent Distributions.**

Any Distribution that is not made on any date specified herein or in the Liquidating Trust Agreement because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be distributed as soon as practicable, and in accordance with the terms of this Plan and the Liquidating Trust Agreement, as applicable, after such Claim is Allowed by a Final Order of the Bankruptcy Court.   On the Final Distribution Date, the Liquidating Trustee shall distribute the remaining assets of the Liquidating Trust to the persons entitled to such assets as provided in Section IV.B.7 under the Plan.

D.     **Delivery of Distributions.**

1.     **General Provisions; Undeliverable Distributions**

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made at (i) the address of each holder as set forth in the Schedule, unless superseded by the address set forth on proofs of Claim filed by such holder or (ii) the last known address of such holder if no proof of Claim is filed or if the Liquidating Trustee has been notified in writing of a change of address.   If any Distribution is returned as undeliverable, the Liquidating Trustee may, in its discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made, but no Distribution to any holder shall be made unless and until the then-current address of the holder has been determined, at which time the Distribution to such holder shall be made to the holder without interest from and after the Effective Date through the date of Distribution. Amounts in respect of any undeliverable Distributions shall be returned to, and held in trust by, the Liquidating Trust until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth in Article V.D.2 of the Plan.   The Liquidating Trustee shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; provided, however, that such discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Liquidating Trust Agreement.

2.     **Unclaimed Property**

Except with respect to property not distributed because it is being held in the Disputed Reserve, Distributions that are not claimed by the expiration of one year from the Effective Date shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code, and the Claims with respect to which those Distributions are made shall be automatically cancelled. After the expiration of that one-year period, the right of any Entity to those Distributions shall be

33

discharged and forever barred.  Nothing contained in the Plan shall require the Plan Agent to attempt to locate any holder of an Allowed Claim.

### E.      Manner of Cash Payments Under the Plan.

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Liquidating Trustee or by wire transfer from a domestic bank, at the option of the Liquidating Trustee, as applicable.

### F.      Time Bar to Cash Payments by Check.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to Article V.F of the Plan shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom the check was originally issued.  Any Claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Effective Date or the first anniversary of the date on which the Claim at issue became an Allowed Claim.  After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall become unclaimed property in accordance with section 347(b) of the Bankruptcy Code.

### G.      Compliance with Tax Requirements.

In connection with making Distributions under the Plan, to the extent applicable, the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Liquidating Trustee may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit.  Any property so withheld will then be paid by the Liquidating Trustee to the appropriate authority.  If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.D.1 of the Plan.

### H.      No Payments of Fractional Dollars and Minimum Distributions.

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar. The Liquidating Trustee shall not be obligated to make any Distribution of less than $10.

### I.      Interest on Claims.

34

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Claim, or portion thereof, that is a Disputed Claim in respect of the period from the Effective Date to the date such Disputed Claim, or portion thereof, becomes an Allowed Claim and Distributions are made on account thereof.  Except as expressly provided in the Plan or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or other similar charges.

### J.    No Distribution in Excess of Allowed Amount of Claim.

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

### K.    Setoff and Recoupment.

The Liquidating Trustee may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any Debtor or Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Liquidating Trustee on behalf of the Debtor, the Estate, the Liquidating Trustee as a successor in interest of any right of setoff or recoupment that any of them may have against the holder of any Claim.

## VIII.  DISPUTED CLAIMS

### A.    No Distribution Pending Allowance.

Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not distribute any Cash or other property on account of any Claim that is Disputed unless and until such Claim or portion thereof becomes Allowed.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been Allowed on the Effective Date.

### B.    Resolution of Disputed Claims; Treatment of Subordinated Claims.

After the Effective Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Liquidating Trustee shall have the right to make and file objections to all Claims.  The cost of pursuing the objections to such Claims shall be paid by the Liquidating Trustee.

4842-2245-2845 v6
2942535-000001

Distributions to Holders of Claims in classes that are subject to contractual subordination provisions are subject to Distribution in accordance with such contractual subordination provisions.  Distributions shall be subject to and modified by any Final Order determining that a Claim is a Subordinated Claim or directing distributions other than as provided in the Plan.  The right of the Liquidating Trustee to seek subordination of any Claim pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim that becomes a Subordinated Claim at any time shall be modified to reflect such subordination.  Unless the Confirmation Order provides otherwise, no Distributions shall be made on account of a Subordinated Claim.

### C.      Objection Deadline.

All objections to Disputed Claims shall be filed and served upon the holders of each such Claim not later than one hundred eighty (180) days after the Effective Date, unless otherwise extended by order by the Bankruptcy Court after notice and a hearing.

### D.      Estimation of Claims.

At any time the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Liquidating Trustee previously objected to such Claim or whether the Bankruptcy Court ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## IX.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.

The Plan shall constitute a motion to reject all Executory Contracts and Unexpired Leases other than those Executory Contracts and Unexpired Leases designated for assumption either in this Plan or in the Executory Contract and Unexpired Lease Assumption and Assignment Schedule, which schedule shall be filed with the Plan Supplement.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all such rejections and assumptions and assignments pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### B.      Claims Based on Rejection of Executory Contracts and Unexpired Leases.

36

Claims resulting from the rejection of Executory Contracts and Unexpired Leases pursuant to Article VI.A, or the expiration or termination of any Executory Contract or Unexpired Lease after the entry of the Confirmation Order, but prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) days after the Effective Date.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to Article VI.B of the Plan. for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, the Estate, the Liquidating Trust, its successors and assigns, and its assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article VIII of the Plan. Unless otherwise ordered by the Bankruptcy Court or provided in this Plan, all such Claims that are timely filed as provided in the Plan shall be treated as a Class C-1 Claim.

The Debtor does not believe that it will have claims based on the rejection of its executory contracts or unexpired leases.

### C.     Cure Claims.

The Proponent shall set forth on the Executory Contract and Unexpired Lease Assumption and Assignment Schedule the monetary cure amount the Debtor believes to be owed with respect to each Executory Contract and Unexpired Lease listed thereon.  Unless the counterparty to an Executory Contract or Unexpired Lease agrees to different treatment, the cure amount set forth on the Executory Contract and Unexpired Lease Assumption and Assignment Schedule with respect to such Executory Contract or Unexpired Lease, or any undisputed portion thereof, or a different amount of the cure Claim that is Allowed by a Final Order shall be paid in full, in Cash, by the trustee of the applicable trust to which such contract or lease has been assigned, in each case, as applicable, on the later of: (i) fifteen (15) Business Days after the Effective Date and (ii) fifteen (15) Business Days after the date such Claim is Allowed.

### D.     Insurance Policies.

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, unless specifically rejected by order of the Bankruptcy Court, all Insurance Policies shall be assumed under the Plan as executory contracts.  Except as provided in Paragraph 2 below, nothing in the Plan or the Confirmation Order shall alter the rights and obligations of the Debtor or the insurers under the Insurance Policies (which rights and obligations shall be determined under the applicable Insurance Policies and applicable non-bankruptcy law relating thereto) or modify the coverage thereunder, and all of the Insurance Policies shall continue in full force and effect according to their terms and conditions.

The P&I Policies, as assumed, shall be assigned to the Liquidating Trust, effective as of the Effective Date, and shall be Liquidating Trust Assets. All other Insurance Policies, as assumed under paragraph 1 above, shall be assigned to the Liquidating Trust, effective as of the Effective Date, and shall be Liquidating Trust Assets.

4842-2245-2845 v6
2942535-000001

## X.   INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A.   Compromise and Settlement.

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Member Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Member Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate and holders of Claims and Member Interests as well as a finding by the Bankruptcy Court that the acts of the Plan Sponsor were completed in good faith.

### B.   Releases.

(a)   *The Releasees*.  The Plan defines the "Releasees" as the Creditors' Committee, and the Professionals of the Creditors' Committee in this Chapter 11 Case.

(b)   *Releases by the Debtor and the Estate*.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, without limitation, the services of the Releasees in facilitating the expeditious implementation of the Plan, the Debtor hereby provides a full release to the Releasees (and each such Releasee so released shall be deemed released and discharged by the Debtor) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence or circumstances, including actions in connection with indebtedness for money borrowed by the Debtor, existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any holder of a Claim or Member Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or its Estate and further including those in any way related to the Estate, the Chapter 11 Cases or the Plan; provided, however, that the foregoing provisions of Article VIII.B.1 of the Plan shall not operate to waive or release the Releasees from any obligation under this Plan, the Liquidating Trust Agreement, or the Confirmation Order, as applicable.

(c)   *Mutual Release related to Class C-2*.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the Creditors' Committee and the Debtor, on behalf of itself, the Estate, and their successors and assigns, including the Liquidating Trustee (collectively, the "First Parties") hereby provide a full release to the Insider Released Parties[4] (and each such Insider Released Party so released shall be

---

[4] The Plan defines the Insider Released Parties to include each of the following: (a) Offshore Express, LLC; (b) Fairways Exploration & Production, LLC; (c) Fairways Energy Resources, LLC; (d) Offshore Exploration and

deemed released and discharged by the First Parties) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence or circumstances, including actions in connection with indebtedness for money borrowed by the Debtor, existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any holder of a Claim or Member Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or its Estate and further including those in any way related to the Estate, the Chapter 11 Cases or the Plan; provided, however, that the foregoing provisions of Article VIII.B.2 shall not operate to waive or release the Insider Released Parties from any obligation under this Plan, the Liquidating Trust Agreement, or the Confirmation Order, as applicable.

And notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the Insider Released Parties hereby provide a full release to the First Parties (and each such First Party so released shall be deemed released and discharged by the Insider Released Parties) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence or circumstances, including actions in connection with indebtedness for money borrowed by the Debtor, existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any holder of a Claim or Member Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or its Estate and further including those in any way related to the Estate, the Chapter 11 Cases or the Plan; provided, however, that the foregoing provisions of this Article VIII.B.2 shall not operate to waive or release the First Parties from any obligation under this Plan, the Liquidating Trust Agreement, or the Confirmation Order, as applicable

(d)     *Mutual Release related to Class C-4.*  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the First Parties hereby provide a full release to USSIC from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether

---

Production, LLC; (e) Offshore Domestic Group, LLC; (f) Fairways Offshore Exploration, Inc.; (g) Avid Ltd.; (h) Pisco Porton LLC; (i) William Kallop; (j) Brent Kallop; (k) members of the Kallop family; (l) Houma Land Holdings LLC; (m) Offshore Seismic Surveys, LLC; (n) AVID Palm Beach, LLC; (o) Kallop Enterprises, LLC; (p) OSF's Affiliates; (q) with respect to each of the foregoing in clauses (a) through (n), each of their respective current and former predecessors, successors, Affiliates, and professionals and advisors, including Hunton Andrews Kurth LLP and The Claro Group, LLC.  Notwithstanding the foregoing, the Insider Released Parties shall not include Steve Williams or any Entity owned or controlled (directly or indirectly) by him.

liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence or circumstances, including actions in connection with indebtedness for money borrowed by the Debtor, existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any holder of a Claim or Member Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or its Estate and further including those in any way related to the Estate, the Chapter 11 Cases or the Plan; provided, however, that the foregoing provisions of Article VIII.B.2 shall not operate to waive or release USSIC from any obligation under this Plan, the Liquidating Trust Agreement, or the Confirmation Order, as applicable.

And notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, USSIC hereby provides a full release to the First Parties (and each such First Party so released shall be deemed released and discharged by the USSIC) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence or circumstances, including actions in connection with indebtedness for money borrowed by the Debtor, existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any holder of a Claim or Member Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or its Estate and further including those in any way related to the Estate, the Chapter 11 Cases or the Plan; provided, however, that the foregoing provisions of this Article VIII.B.2 shall not operate to waive or release the First Parties from any obligation under this Plan, the Liquidating Trust Agreement, or the Confirmation Order, as applicable.

(e)     Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article VIII.B of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are:  (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtor and all holders of Claims and Member Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Releasees asserting any Claim or Cause of Action thereby released.

### C.     Exculpation.

Notwithstanding anything contained in the Plan to the contrary, the Releasees shall neither have nor incur any liability to any Entity for any Claims or Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering,

confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or Disclosure Statement or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Plan; *provided*, *however*, that the provisions of Article VIII.C of the Plan shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided*, *further*, that each Releasee shall be entitled to rely upon the advice of counsel concerning its duties; *provided*, *further*, that the provisions of Article VIII.C of the Plan shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or any defenses thereto.

### D.     Injunction.

1.     Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor or the Liquidating Trustee, their successors and assigns and their assets and properties, as the case may be, any suit, action or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

(a)     Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Debtor in Possession, the Estate, the Creditors' Committee, the Liquidating Trustee, their successors and assigns and their assets and properties, any other Claims or Member Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

(b)     The rights afforded in the Plan and the treatment of all Claims and Member Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Member Interests of any nature whatsoever, against the Debtor or any of their assets or properties.  On the Effective Date, all such Claims against, and Member Interests in, the Debtor shall be satisfied and released in full.

(c)     Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Member Interest satisfied and released hereby, from:

41

i. commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, the Liquidating Trustee, their successors and assigns and their assets and properties;

ii. enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, the Liquidating Trustee, their successors and assigns and their assets and properties;

iii. creating, perfecting or enforcing any encumbrance of any kind against any Debtor, the Liquidating Trustee or the property or estate of any Debtor or Liquidating Trustee;

iv. asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Debtor or against the property or estate of any Debtor or the Liquidating Trustee, except to the extent a right to setoff, recoupment or subrogation is asserted with respect to a timely filed proof of claim; or

v. commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Member Interest or Cause of Action released or settled hereunder.

 **E.** **Release of Liens.**

 Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate, shall be fully released and discharged, and all of the Debtor' rights, title and interests in such property shall be distributed or transferred in accordance with the Plan.

## XI. RISK FACTORS

 PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

 **A.** **Certain Bankruptcy Law Considerations.**

 **1.** **Parties in Interest May Object to the Classification of Claims and Member Interests**

 Section 1122 of the Bankruptcy Code provides that a plan may place a claim or a Member Interest in a particular class only if such claim or Member Interest is substantially similar to the other claims or Member Interests in such class. The Proponent believes that the classification of Claims and Member Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan creates seven Classes of Claims and Member Interests, each encompassing Claims or Member Interests, as applicable, that are substantially

similar to the other Claims and Member Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, as discussed above, the Committee classified the claims of personal injury claimants, Affiliates, and USSIC separately from other unsecured creditors. This classification structure is essential to the implementation of the settlement among the Committee, OSF, the Affiliates, and USSIC. If a party in interest objects to the classification structure, and the Bankruptcy Court decides that the claims of these creditors should be classified in Class C-1 with other general unsecured creditors, then the Plan likely is not confirmable.

### 2.     The Proponent May Fail to Satisfy Vote Requirements

If votes are received in an amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Proponent intends to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Proponent may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 3.     The Proponent May Not be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, including, among other requirements, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non-accepting holders of claims and Member Interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim and/or Member Interest might challenge whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the Disclosure Statement, the balloting procedures and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in the Plan. If the Plan is not confirmed, it is unclear what Distributions, if any, holders of Allowed Claims and Member Interests would receive with respect to their Allowed Claims and/or Member Interests.

The Proponent reserves the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in a less favorable treatment of

any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a Distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no Distribution of property whatsoever under the Plan.

### 4. The Proponent May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Proponent reserves the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where that Claim is subject to an objection.  Thus, any holder of a Claim that is subject to an objection may receive less than its expected share of the estimated distributions described in this Disclosure Statement or no distribution at all.

### 5. Nonconsensual Confirmation

In the event that any impaired class does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the Proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtor believes that the Plan satisfies these requirements and will request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 6. The Conditions Precedent to the Effective Date May Not Occur

As more fully set forth in Article VII of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not occur.

### 7. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims and Member Interests under the Plan can be impacted by a variety of contingencies, including without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect Distributions available to holders of Allowed Claims and Member Interests under the Plan, will not affect the validity of the votes taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class(es).

### 8. Risks Regarding Financial Analysis

4842-2245-2845 v6
2942535-000001

The liquidation analysis set forth in **Exhibit B** to this Disclosure Statement represents the Proponent's best estimate of the Liquidating Trustee's future financial performance based on currently known facts and assumptions about the value of the Estate. These facts and assumptions are based almost exclusively on information provided by OSF and its books and records; accordingly, while the Proponent believes this information is the best available information under the circumstances, the Proponent cannot vouch for the accuracy of this information. The Liquidating Trustee's actual financial results may differ significantly from the financial analysis set forth on **Exhibit B**. If the Liquidating Trustee does not achieve its projected financial results, the recovery for creditors from the Liquidating Trust may be significantly less than shown on **Exhibit B**. Moreover, the financial condition and results of the Liquidating Trust from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor' historical financial statements.

### 9.    Certain Tax Implications of the Chapter 11 Case

Holders of Claims and Member Interests should carefully review Section XIV hereof to determine how the tax implications of the Plan and the Chapter 11 Case may adversely affect the Liquidating Trustee and certain holders of Claims and Member Interests. The tax consequences of the Plan are complicated.

### 10.    Confirmation and Consummation May Be Delayed if the Proponent Has to Resolicit.

If the Proponent resolicits acceptances of the Plan from the parties entitled to vote thereon, the confirmation of the Plan could be delayed and possibly jeopardized.

### B.    Risk Factors That May Affect Distributions Under The Plan.

### 1.    The Proponent Cannot State with Any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims or Member Interests in Voting Classes

A number of unknown factors make certainty in creditor recoveries impossible. For instance, the Proponent cannot know with any certainty, at this time, the number or amount of Claims and Member Interests that will ultimately be Allowed or the ultimate value or collectability of certain assets, such as the Montco Receivable.

### 2.    Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Recovery on Claims or Member Interests

The estimates of Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amounts of Allowed Claims may be significantly higher or lower than the estimated amount of Allowed Claims contained herein. Additionally, the Debtor has made certain assumptions, as described herein, regarding liquidation under chapter 7 of the Bankruptcy Code, **which should be read carefully.**

45

### 3.     Disclosure Statement Disclaimer

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtor to object to that holder's Allowed Claim, or the Debtor' right to bring Causes of Action.

### 4.     Liquidation Under Chapter 7

If no chapter 11 plan is confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtor for Distribution in accordance with the priorities established by the Bankruptcy Code.  The Proponent believes that any such conversion would likely reduce any Distribution to holders of Claims and Member Interests based on, among other things, (i) the increased costs of a chapter 7 case arising from the fees payable to a chapter 7 trustee and professional advisors to such trustee as well as the litigation costs to disallow the Affiliate Claims and USSIC Claim; (ii) substantial increases in claims which would be satisfied on a priority basis; (iii) the substantially longer period of time that would elapse until distributions could be made under chapter 7; and (iv) the possibility that, without the settlement among the Committee, OSF, the Affiliates, and USSIC, the claims of the Affiliates and USSIC will be allowed, thereby diluting the amount of distributions for other creditors.

In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtor would be sold in an orderly fashion.  Accordingly, creditors would likely receive greater recoveries than in a chapter 7 liquidation.  Furthermore, the Proponent believe that a liquidation through the Plan allows for the trustee (1) to make an initial distribution to creditors faster (i.e. once the trustee has established appropriate reserves for Disputed Claims) and (2) to limit the administrative cost of the estate post-confirmation, because the liquidating trustee (a) will not be entitled to a percentage of assets distributed, and (b) will avoiding having to litigate the disallowance of the claims of Affiliates and USSIC, with resulting reduction in costs.

Attached as **<u>Exhibit B</u>** is a copy of the Liquidation Analysis as of the Effective Date.

### PARTIES ARE URGED TO CAREFULLY REVIEW THE LIQUIDATION ANALYSIS

## XII.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the Disclosure Statement Order [ECF No. [●]].

***The Disclosure Statement Order are incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.***

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO**

THE DISCLOSURE STATEMENT ORDER AND THE INSTRUCTIONS ACCOMPANYING THE BALLOT FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.      Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of Claims against a debtor are entitled to vote on a chapter 11 plan.  The table in Section II.F of the Disclosure Statement provides a summary of the status and voting rights of each Class under the Plan.  As shown in the table, the Debtor is soliciting votes to accept or reject the Plan only from holders of Classes C-1, C-2, C-3, and C-4 (together, the "Voting Classes").  The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Proponent is not soliciting votes from holders of certain Claims and Member Interests as described in Article II.C of the Plan.  Additionally, the Disclosure Statement Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.      Voting Record Date.

**The Voting Record Date is September 10, 2018.**  The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

### C.      Voting on the Plan.

**The Voting Deadline is October 11, 2018, at 5:00 p.m. (prevailing Central Time).**  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by Creditors' Committee Counsel on or before the Voting Deadline at the following address:

| If by Regular Mail: | If by Messenger or Overnight Delivery: |
|---|---|
| Baker Donelson<br>Attn: Cynthia Lujano<br>1301 McKinney Street, Suite 3700<br>Houston, TX 77010 | Baker Donelson<br>Attn: Cynthia Lujano<br>1301 McKinney Street, Suite 3700<br>Houston, TX 77010 |

### D.      Ballots Not Counted.

47

**No ballot will be counted toward confirmation if, among other things:**

1.  it is illegible or contains insufficient information to permit the identification of the holder of the Claim;

2.  it was transmitted by facsimile, email, or other electronic means other than as specifically set forth in the ballots;

3.  it was cast by an Entity that is not entitled to vote on the Plan;

4.  it was cast for a Claim listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed, for which the applicable Claims bar date has passed and no Proof of Claim was timely filed, or to which the Debtor, the Creditors' Committee, or another party-in-interest with standing has objected, and such objection remains unresolved;

5.  it was sent to the Proponent, the Proponent's agents/representatives (other than Creditors' Committee Counsel), or the Proponent's financial or legal advisors instead of the Creditors' Committee Counsel;

6.  it was sent to the Debtor, the Debtor's agents/representatives, or the Debtor's financial or legal advisors;

7.  it is unsigned; or

8.  it is not clearly marked to either accept or reject the Plan, or it is marked both to accept and reject the Plan.

**Please refer to the Disclosure Statement Order, and the instructions accompanying the ballot provided to you for additional requirements with respect to voting to accept or reject the Plan.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT CATHY M. BURROW AT 713-333-5130.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, OR THE INSTRUCTIONS ACCOMPANYING THE BALLOT PROVIDED TO YOU WILL <u>NOT</u> BE COUNTED.**

## XIII.   CONFIRMATION OF THE PLAN

### A.   Requirements for Confirmation of the Plan.

Among the requirements for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Member Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is

"fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims and Member Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Proponent believes that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Proponent has complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a Claim or an Member Interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the Debtor were liquidated under chapter 7.

Attached hereto as **Exhibit B** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Proponent with the assistance of its advisors and the Debtor and its advisors. As reflected in the Liquidation Analysis, the Proponent believe that liquidation of the Debtor's business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan.

Consequently, the Proponent believes that confirmation of the Plan will likely provide a greater return to holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Proponent proposes an orderly liquidation of the Debtor's estate under the Plan; as a result, Section 1129(a)(11) is not applicable to the Plan.  The Liquidation Analysis is attached hereto as **Exhibit B** and incorporated herein by reference.  Based upon the Liquidation Analysis, the Proponent believes that the Liquidating Trustee will have sufficient Available Cash to meet expenses of the Liquidating Trust over the course of the trust's term.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or Member Interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and,

therefore, solicitation of acceptances with respect to such a class is not required.[5]   Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.   Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.   Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or Member Interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Proponent reserves the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Proponent will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.   The Proponent reserves the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.   No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.   The test does not require that the treatment be the same or equivalent, but that treatment be "fair."   In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.,* classes of the same legal character).   Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.   A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive

---

[5]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or Member Interest entitles the holder of such claim or Member Interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or Member Interest entitles the holder of such claim or Member Interest.

4842-2245-2845 v6
2942535-000001

more than 100 percent of the amount of the allowed claims in the class.  As to a dissenting class, the test sets different standards depending upon the type of claims or Member Interests in the class.

### (a)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

### (b)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.

### (c)    Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of:  (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) if the class does not receive the amount as required under (i) no class of interests junior to the non-accepting class may receive a distribution under the plan.

## XIV.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtor and certain holders of Claims.  This summary is based on the Internal Revenue Code, Treasury Regulations thereunder and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Proponent does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below.  There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

51

This summary does not apply to holders of Claims that are not U.S. Persons (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies and regulated investment companies). Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtor and holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### A.      Federal Income Tax Consequences to the Debtor.

The Debtor will generally recognize gain or loss on the sale, or transfer to the Liquidation Trust, of substantially all of its assets equal to the difference between (a) the amount of any money and the fair market value of the assets sold or transferred to the Liquidation Trust, and (b) the Debtor's adjusted tax basis in the assets sold or transferred. The character of any gain or loss will depend upon the nature of assets sold or transferred and the Debtor's holding period for the assets.

In general, absent an exception, the discharge of a debt obligation for cash and property having a value less than the amount owed gives rise to cancellation of debt ("COD") income, which must be included in the debtor's taxable income unless one of various exceptions applies. One such exception is for COD income arising in a bankruptcy proceeding. Under this exception, the taxpayer does not include the COD income in its taxable income, but must instead reduce the following tax attributes, in the following order, by the amount of COD income: (i) NOLs and NOLs carryovers (beginning with NOLs for the year of the COD income, then the oldest and then next-to-oldest NOLs, and so on), (ii) general business credit carryovers, (iii) alternative minimum tax credits, (iv) capital losses and capital loss carryovers, (v) tax basis of assets (but limited to the excess of aggregate adjusted bases over the liabilities remaining after debt cancellation), (vi) passive activity losses and credit carryovers, and (vii) foreign tax credits carryovers. Alternatively, a debtor may elect to first reduce the basis of its depreciable and amortizable property. The debtor's tax attributes are not reduced until after determination of the debtor's tax liability for the year of the COD income. Any COD income in excess of available tax attributes is excluded from income.

### B.      Federal Income Tax Consequences to Creditors/Beneficiaries.

52

In accordance with the Plan, certain classes of Claims are impaired and will not be paid in full with respect to such Claims as set forth in the Plan.  Holders of such Claims, namely the holders of Allowed Class C-1 Claims, Class C-2 Claims, Class C-4 Claims, and, potentially, the holders of Class C-3 Claims, will be subject to certain federal income tax consequences. A creditor who receives cash or other property, including Liquidation Trust Assets deemed received as discussed below, in satisfaction of its claim may recognize either gain or loss upon receipt of such payment or property equal to the difference between the "amount realized" by such creditor and such creditor's adjusted tax basis in its Claim.  The amount realized is equal to the value of such creditor's payment with respect to its Claim.  Any gain or loss realized by a creditor should constitute ordinary income or loss to such creditor unless such Claim is a capital asset.  If a Claim constitutes a capital asset in the hands of an unsecured creditor, and it has been held for more than one year, such creditor will realize long-term capital gain or loss upon the receipt of payment.

If the Liquidation Trust is treated as a "liquidating trust," then, upon its creation, the beneficiaries (that is, the holders of Allowed Class C-1 Claims) would be treated as having received and as owning an undivided interest in the Liquidation Trust Assets in exchange for surrendering all or a portion of such Beneficiary's Claim followed by a transfer by the holders of such assets to the Liquidation Trust.  Under the Plan, all parties, including, without limitation, the Debtor, the Liquidation Trustee, and the Beneficiaries, are required to report consistently with the foregoing for federal and applicable state and local income tax purposes.  The basis of such Beneficiary's interest in the Liquidation Trust Assets will be equal to their fair market value as of the Effective Date.  The fair market value transferred to each Beneficiary will be determined by the Liquidation Trustee, and all parties must use such value for income tax purposes.  The determination of the fair market value of the Liquidation Trust Assets is factual in nature and the IRS may challenge any such determination.

Beneficiaries treated as grantors or owners in the Liquidation Trust must report on their respective U.S. federal income tax returns their allocable share of income, gain, loss, deduction, and credit recognized or incurred by the Liquidation Trust.  Deductions attributable to activities and administrative expenses of the Liquidation Trust may be subject to limitation in the hands of Beneficiaries.  Upon the sale or other disposition of any Liquidation Trust Assets, each Beneficiary must report on its U.S. federal income tax return its share of any gain or loss measured by the difference between (i) its share of the amount of cash or fair market value of any property received by the Liquidation Trust in exchange for the assets sold or disposed of, and (ii) such Beneficiary's adjusted tax basis in its share of such asset.  The character of any such gain or loss to any Beneficiary will be determined as if the Beneficiary itself had directly sold or otherwise disposed of the asset.  The character of items of income, gain, loss, deduction, and credit to any Beneficiary, and the ability of such Beneficiary to benefit from any deductions or losses, will depend on such Beneficiary's particular circumstances.

Beneficiaries may incur tax liability as a result of owning a beneficial interest in the Liquidation Trust, regardless of whether the Liquidation Trust makes any Distributions.  Due to the Liquidation Trust's requirements to satisfy certain liabilities, and due to possible differences in the timing of income on Liquidation Trust Assets, Beneficiaries may, in certain years, be

4842-2245-2845 v6
2942535-000001

required to report and pay tax on a greater amount of income than the amount of any Distributions received in such year.

The tax consequences to creditors will differ and will depend on factors specific to each such creditor, including but not limited to: (i) whether the creditor's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the creditor's Claim, (iii) whether the creditor is a U.S. person or a foreign person for U.S. federal income tax purposes, (iv) whether the creditor reports income on the accrual or cash basis method, and (v) whether the creditor has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

### C.    Federal Income Tax Consequences to the Liquidating Trust.

The Liquidation Trust will be organized for the primary purpose of liquidating the Liquidation Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose. Thus, the Liquidation Trust is intended to be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d). Under the Plan, all relevant parties are required to treat the Liquidation Trust as a liquidating trust, subject to definitive guidance to the contrary from the IRS. In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to sections 671 et seq. of the Tax Code, owned by the grantors of the trust. For this purpose, the beneficiaries of a liquidating trust, that is, the Beneficiaries are treated as the grantors of the trust.

Although the Liquidation Trust has been structured with the intention of complying with guidelines established by the IRS in Rev. Proc. 94-45, 1994-2 C.B. 684, for the formation of liquidating trusts, it is possible that the IRS could require a different characterization of the Liquidation Trust, which could result in a different and possibly greater tax liability to the Liquidation Trust or to the Beneficiaries. No request for a ruling from the IRS will be sought on the classification of the Liquidation Trust, and there can be no assurance that the IRS will not take a contrary position as to the classification of the Liquidation Trust. If the IRS were to successfully challenge the classification of the Liquidation Trust as a grantor trust, the U.S. federal income tax consequences to the Liquidation Trust and the Beneficiaries could be materially different from those discussed herein.

### D.    Information Reporting and Backup Withholding.

In general, information reporting requirements may apply to distributions or payments under the Plan. All distributions to holders of Allowed Claims and Interests under the Plan are subject to any applicable withholding obligations. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate. Backup withholding generally applies if the holder (1) fails to furnish its social security number or other taxpayer identification number ("TIN"); (2) furnishes an incorrect TIN; (3) fails properly to report interest or dividends; or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an

54

overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

>    **E.**      **Importance of Obtaining Professional Tax Assistance.**

>    **The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan, does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of such holder's circumstances and tax situation and is not a substitute for consultation with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences of the Plan are complex and are in many cases uncertain and may vary depending on a claimant's particular circumstances. Accordingly, all Holders of Claims and Equity Interests are strongly urged to consult their own tax advisors about the federal, state, local, and applicable non-U.S. income and other tax consequences to them under the Plan, including with respect to tax reporting and record keeping requirements.**

## XV.    CONCLUSION AND RECOMMENDATION

In the opinion of the Proponent, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtor's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. Further, the Proponent believes that payments will be made to creditors more quickly under this Plan than in a Chapter 7.   In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than that which is proposed under the Plan.   Accordingly, the Proponent recommends that holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan by returning their Ballots so that they will be received by the Claims Agent no later than 5:00 p.m. (prevailing Central Time) on October 11, 2018.

*[Remainder of Page Intentionally Left Blank]*

4842-2245-2845 v6
2942535-000001

| Dated: September 10, 2018<br>Houston, Texas | **Official Committee of Unsecured Creditors for Offshore Specialty Fabricators, LLC**<br><br>**By**:   **Retif Oil & Fuel, LLC**<br>**Its:**   **Chairman**<br><br>By:   */s/ Kenneth J. Retif*<br>Its:   President |

Prepared by:

*/s/ Daniel J. Ferretti*
Susan C. Mathews
Texas Bar No. 05060650
smathews@bakerdonelson.com
Daniel J. Ferretti
Texas Bar No. 24096066
dferretti@bakerdonelson.com
1301 McKinney St., Suite 3700
Houston, TX 77010
Telephone:  (713) 650-9700
Facsimile:  (713) 650-9701

  -AND-

Jan M. Hayden
(Admitted Pro Hac Vice)
Louisiana Bar No. 6672
jhayden@bakerdonelson.com
Edward H. Arnold, III
Louisiana Bar No. 18767
Federal ID No. 17158
harnold@bakerdonelson.com
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-8645
Facsimile: (504) 585-6945

*Attorneys for Official Committee of Unsecured Creditors for Offshore Specialty Fabricators, LLC*

**<u>Exhibit A</u>**

(Plan of Reorganization)

[Separately Included in Solicitation Packet and Filed at Docket No.[●]]

**Exhibit B**

(Liquidation Analysis)

**Overview**

Pursuant to section 1129(a)(7) of the Bankruptcy Code, a Chapter 11 plan cannot be confirmed unless the Bankruptcy Court determines that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan. The "best interests" test requires a Bankruptcy Court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member, who has not accepted the plan, with a recovery of property of a value, as of the effective date of the plan, not less than the amount that such member would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. The Liquidation Analysis (the "Analysis") is based on the Debtor's balance sheet as of May 15, 2018 (except as indicated). The Analysis reflects the estimated net value of the Debtor's assets, assuming the Debtor was liquidated under the provisions of Chapter 7 of the Bankruptcy Code, and the net proceeds of the liquidation (net of liquidation-related costs, setoffs and recoupment rights) were distributed to creditors pursuant to the provisions of Chapter 7. The value available for distribution to creditors as of the date of an actual liquidation may differ from the value used in this Analysis - the differences may potentially be material.

The Proponent believes that the Plan meets the "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code because holders of allowed claims in each impaired class will either accept the Plan or receive at least as much under the Plan as they would if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code, assuming the most likely scenarios with respect to the size of the claims pool and the success of the liquidation.

**Assumptions and Limitations**

The Analysis was prepared by the Proponent based on information received from the Debtor's management, and includes good faith assumptions, which are believed to be reasonable and appropriate in light of the circumstances under which they are based. For purposes of this Analysis, the Proponent assumes a chapter 7 liquidation would be conducted in an orderly fashion and will take place over two month time horizon. Unless explicitly stated elsewhere, recoveries are net of necessary liquidation expenses. While the Proponent considers the estimates and assumptions contained within this Analysis to be reasonable, they are inherently subject to significant uncertainties and contingencies beyond their control.

If actual results are lower than those shown, or if the assumptions used in formulating the Analysis are not realized, distribution to each member of each class of Claims could be affected adversely. Accordingly, there can be no assurance that the results shown would be realized if the Debtor was liquidated, and actual results in such case could vary materially from those presented.

The underlying financial information in this Analysis has not been examined, compiled or reviewed by the Debtor's financial advisors or independent accountant, or any other independent accountant in accordance with standards promulgated by American Institute of Certified Public Accountants. No independent appraisals were conducted in preparing this Analysis.   The

liquidation values included in this Analysis are based on OSF's management's familiarity with the assets and its estimates of recoveries upon monetization of such assets in a Chapter 7 scenario.

Under section 1126 of the Code, the holder of a claim allowed under section 502 of the Bankruptcy Code may accept or reject the Plan. This section requires a creditor to have an allowed claim in order to vote. In accordance with section 502(a) of the Code, a claim, proof of which is filed under section 501, is deemed allowed, unless a party in interest files an objection to such claim. The pre-petition unsecured claims included in this Analysis were estimated based on the claims listed on the Debtor's Schedules of Assets and Liabilities filed in accordance with section 521(a)(1)(B)(i) and proofs of claims ("POCs") filed by creditors in accordance with section 501 of the Code. Section 1111(b) states that a proof of claim, included on the Debtor's schedule of liabilities, is deemed filed under section 501, as long as such claim is not unliquidated, disputed or contingent, in which case such creditor would generally be required to file a POC in order to have a right to payment from the estate.

The Debtor is in the process of reviewing all scheduled and filed proofs of claims. Creditor distributions are predicated on the final outcome and the results of the Debtor's claims resolution and analysis, and ultimately subject to a final determination by the Bankruptcy Court.

The Analysis assumes the Debtor's Chapter 11 case is converted to a Chapter 7 case on November 1, 2018.

| OSF Claims Analysis | CHAPTER 7 | | | PLAN TRUST | | |
|---|---|---|---|---|---|---|
| Conversion/Effective Date: Nov. 1, 2018 | Min Recovery | Mid Recovery | Max Recovery | Min Recovery | Mid Recovery | Max Recovery |
| Claims Class | Claim Amounts | | | Claim Amounts | | |
| General Unsecured Claims (C-1) | $ 7,600,000.00 | $ 7,600,000.00 | $ 7,600,000.00 | $ 7,600,000.00 | $ 7,600,000.00 | $ 7,600,000.00 |
| Affiliate/Insider Claims (C-2) | $ 57,226,152.00 | $ 28,613,076.00 | $ - | $57,226,152.00 | $57,226,152.00 | $ 57,226,152.00 |
| Unsecured Personal Injury Claims (C-3) | $ 425,000.00 | $ 212,500.00 | $ 50,000.00 | $ 425,000.00 | $ 212,500.00 | $ 50,000.00 |
| USSIC Claim (C-4) | $ 14,800,000.00 | $ 7,400,000.00 | $ - | $14,800,000.00 | $14,800,000.00 | $ 14,800,000.00 |
| Total Claims Pool | $ 80,051,152.00 | $ 43,825,576.00 | $ 7,650,000.00 | $80,051,152.00 | $79,838,652.00 | $ 79,676,152.00 |
| | | | | | | |
| Liquidation Analysis | | Chapter 7 | | | Plan Trust | |
| | Min Recovery | Mid Recovery | Max Recovery | Min Recovery | Mid Recovery | Max Recovery |
| Cash on Hand | $ 3,100,000.00 | $ 3,200,000.00 | $ 3,300,000.00 | $ 3,100,000.00 | $ 3,200,000.00 | $ 3,300,000.00 |
| Liquidation of Hard Assets (see Note 1) | $ 50,000.00 | $ 262,500.00 | $ 475,000.00 | $ 50,000.00 | $ 262,500.00 | $ 475,000.00 |
| Montco Receivable | $ - | $ 350,000.00 | $ 700,000.00 | $ - | $ 350,000.00 | $ 700,000.00 |
| JAB Receivable | $ - | $ 250,000.00 | $ 500,000.00 | $ - | $ 250,000.00 | $ 500,000.00 |
| Linder Judgment | $ - | $ - | $ - | $ - | $ - | $ - |
| Causes of Action | $ - | $ 635,000.00 | $ 1,270,000.00 | $ - | $ 195,000.00 | $ 390,000.00 |
| (Less Ch. 7 Administrative Expenses) | $ (300,000.00) | $ (300,000.00) | $ (300,000.00) | $ - | $ - | $ - |
| (Less Ch. 11 Administrative Expenses & Priority Claims) | $ (671,111.70) | $ (671,111.70) | $ (671,111.70) | $ (671,111.70) | $ (671,111.70) | $ (671,111.70) |
| (Less Trustee Compensation) | $ (119,100.00) | $ (165,525.00) | $ (211,950.00) | $ (120,000.00) | $ (120,000.00) | $ (120,000.00) |
| Total Available Liquidation Proceeds | $ 2,059,788.30 | $ 3,560,863.30 | $ 5,061,938.30 | $ 2,358,888.30 | $ 3,466,388.30 | $ 4,573,888.30 |
| | | | | | | |
| Possible Unsecured Creditor Recoveries | | Chapter 7 | | | Plan Trust | |
| | Min Recovery | Mid Recovery | Max Recovery | Min Recovery | Mid Recovery | Max Recovery |
| Recovery (Class C-1) | 3% | 8% | 66% | 16% | 26% | 35% |
| Recovery (Class C-2) | 3% | 8% | 0% | 1% | 2% | 3% |
| Recovery (Class C-3) (see Note 2) | varies | varies | varies | varies | varies | varies |
| Recovery (Class C-4) | 3% | 8% | 0% | 2.70% | 2.70% | 2.70% |

Note 1: These figures assume the following maximum values: scrap ($50,000) + accommodations module ($150,000) + office building ($275,000)

Note 2: The recovery of Class C-3 depends on the liquidated value of each claim and the availability of remedies against insurers

2

## Exhibit C-1

(Statement of Affiliates with Respect to Claims)

1.      On February 5, 2018, Offshore Express, LLC; Fairways Exploration & Production, LLC; Fairways Energy Resources, LLC; Offshore Exploration and Production, LLC; and Offshore Domestic Group, LLC, filed Proofs of Claim Nos. 128, 129, 130, 131, and 132 (the "Affiliate Claims"), respectively.

2.      On July 13, 2018, the Committee filed its objections to the Affiliate Claims [see Docket Nos. 660-664] (the "Committee's Objections").

3.      Pursuant to certain scheduling orders [*see* Docket Nos. 672 and 680], the Committee and certain of the Affiliates commenced discovery in connection with the Committee's Objections to the Affiliate Claims.

4.      During the discovery, negotiations among the certain Affiliates and the Committee commenced and ultimately resulted in a settlement of the Affiliate Claims.

5.      The Plan includes the terms of the settlement.

**Exhibit C-2**

(Payments to Affiliates - Affiliates' Liability will be Released under Plan)

Jan. 1, 2015 - Sept. 30, 2016

| | | |
|---|---|---|
| 2/19/2015 | OFFSHORE EXPRESS, LLC | $500,000.00 |
| 2/27/2015 | OFFSHORE EXPRESS, LLC | 200,000.00 |
| 5/5/2015 | CAP CANA CARIBE - OE - (NATITA II 22,329.30, BAD GIRL 12,262.37) | 34,591.67 |
| 5/14/2015 | FREEPORT SHIP SERVICES LIMITED - NATITA | 2,460.00 |
| 5/28/2015 | RYBOVICH BOAT CO. LLC (NATITA) | 24,849.51 |
| 6/24/2015 | OFFSHORE EXPRESS, LLC | 1,000,000.00 |
| 6/29/2015 | OFFSHORE EXPRESS, LLC | 190,000.00 |
| 8/31/2015 | AMERICAN EXPRESS TRAVEL  - AVID | 17,844.43 |
| 11/25/2015 | OFFSHORE EXPRESS, LLC - PAYROLL ACCT - AVID PAYROLL | 605,507.78 |
| 11/30/2015 | PETER C. KALLOP | 10,000.00 |
| 11/30/2015 | JOHNNY SCHULER | 10,000.00 |
| 11/30/2015 | ANINA FIELD KALLOP | 3,500.00 |
| 11/30/2015 | MARIE MORENO | 2,400.00 |
| 11/30/2015 | OFFSHORE EXPRESS, LLC - NEW GENERAL ACCT | 200,000.00 |
| 12/3/2015 | KENDALL SPRIGGS - WMK | 10,000.00 |
| 12/30/2015 | OE PAYROLL TRANSFER - AVID | 575,000.00 |
| 2/25/2016 | OFFSHORE EXPLORATION AND PRODUCTION | 300,000.00 |
| 2/26/2016 | OFFSHORE EXPRESS | 650,000.00 |
| 2/29/2016 | OFFSHORE EXPRESS | 250,000.00 |
| 3/2/2016 | OFFSHORE EXPRESS | 100,000.00 |
| 3/3/2016 | OFFSHORE EXPRESS | 125,000.00 |
| 3/4/2016 | OFFSHORE EXPRESS | 100,000.00 |
| 3/7/2016 | OFFSHORE EXPRESS | 150,000.00 |
| 3/11/2016 | OFFSHORE EXPRESS | 100,000.00 |
| 4/13/2016 | OFFSHORE EXPRESS | 70,000.00 |
| 6/6/2016 | OSF TRANSFER - OEI (LAGUNA AUTO PREMIUM) | 6,070.05 |
| 6/16/2016 | OSF TRANSFER - OEI (AFCO) | 5,841.17 |
| 6/24/2016 | OFFSHORE EXPRESS - MEDICAL REIMBURSEMENT | 111,041.60 |
| 7/8/2016 | OFFSHORE EXPRESS - BLUE CROSS, AFCO | 13,660.19 |
| 7/12/2016 | OFFSHORE EXPRESS - CATAMARAN | 46,000.00 |
| 8/5/2016 | OFFSHORE EXPRESS - BLUE CROSS, CONEXIS | 42,229.30 |
| 8/19/2016 | OFFSHORE EXPRESS - AFCO (5,841.00) ENTERGY DEPOSIT (-1733.12) | 4,107.88 |
| 8/22/2016 | OFFSHORE EXPRESS - CATAMARAN | 46,000.00 |
| 8/26/2016 | OFFSHORE EXPRESS - BERMUDA GOVERNMENT | 8,000.00 |
| 8/31/2016 | OFFSHORE EXPRESS - AVID PAYROLL | 342,606.14 |
| 9/15/2016 | OFFSHORE EXPRESS (BLUE CROSS, CATAMARAN, AFCO, BOURGEOIS BENNETT) | 120,000.00 |
| 9/30/2016 | OFFSHORE EXPRESS (BLUE CROSS) | 80,302.52 |
| | **SUBTOTAL: 1/1/15-9/30/16** | **$5,976,709.72** |

Oct. 1, 2016 - Oct. 1, 2017

| | | |
|---|---|---|
| 10/31/2016 | OFFSHORE EXPRESS - AVID PAYROLL / GEO BLUE INSURANCE | $435,500.00 |
| 11/1/2016 | OFFSHORE EXPRESS - AVID | 80,000.00 |
| 11/3/2016 | OFFSHORE EXPRESS - AVID | 50,000.00 |
| 11/4/2016 | OFFSHORE EXPRESS - AVID | 154,000.00 |
| 11/15/2016 | OFFSHORE EXPRESS - AVID | 67,000.00 |
| 11/18/2016 | OFFSHORE EXPRESS - AVID | 7,000.00 |
| 11/22/2016 | OFFSHORE EXPRESS - AVID | 53,500.00 |
| 11/29/2016 | OFFSHORE EXPRESS - FS AIR | 15,000.00 |
| 12/2/2016 | OFFSHORE EXPRESS - AVID P.R, CATAMARAN, AVID AIR | 747,000.00 |
| 12/8/2016 | OFFSHORE EXPRESS - PRICE FORBES, LENAC | 305,000.00 |
| 12/12/2016 | OFFSHORE EXPRESS - ASTA | 25,000.00 |
| 12/12/2016 | OFFSHORE EXPRESS - EVEREST FUEL | 25,000.00 |
| 12/15/2016 | OFFSHORE EXPRESS - GLOBAL AGENT | 3,600.00 |
| 12/15/2016 | OFFSHORE EXPRESS - GLOBAL AGENT | 250.00 |
| 12/29/2016 | OFFSHORE EXPRESS - AVID P/R & AVID AIR FUEL | 332,500.00 |
| 12/29/2016 | OFFSHORE EXPRESS - LENAC, RYBOVICH | 85,500.00 |
| 1/3/2017 | OFFSHORE EXPRESS - LLOYD'S REGISTER | 26,000.00 |
| 1/3/2017 | MORGAN CITY OF LA / HOUMA DISTRIBUTOR (BAD GIRL) | 231.44 |
| 1/3/2017 | KEAN MILLER LLP (AVID) | 11,951.20 |
| 1/3/2017 | BATTERIES PLUS HOLDING BATTERIES PLUS, LLC (BAD GIRL) | 1,557.00 |
| 1/3/2017 | BATTERIES PLUS HOLDING BATTERIES PLUS, LLC (BAD GIRL) | 1,199.50 |
| 1/4/2017 | SCURLOCK ELECTRIC, LLC (BAD GIRL) | 1,053.90 |
| 1/4/2017 | WEST MARINE (BAD GIRL) | 342.50 |
| 1/4/2017 | OFFSHORE EXPRESS - LENAC, RYBOVICH | 106,000.00 |
| 1/4/2017 | OFFSHORE EXPRESS - MTN, CENTRAL CITY MILLWORKS | 36,500.00 |
| 1/4/2017 | MORGAN CITY OF LA / HOUMA DISTRIBUTOR (BAD GIRL) | 328.64 |
| 1/4/2017 | WEST MARINE (BAD GIRL) | 331.27 |
| 1/4/2017 | QUALITY GLASS & LOCK (BAD GIRL) | 7,108.00 |
| 1/4/2017 | MARK HENDRIX (BAD GIRL) | 4,200.00 |
| 1/4/2017 | MICHAEL SUMMERS (BAD GIRL PROVISIONS) | 1,000.00 |
| 1/5/2017 | FPS-NEW ORLEANS (BAD GIRL) | 14,795.58 |
| 1/5/2017 | DELTA RIGGING (BAD GIRL) | 550.24 |
| 1/5/2017 | OFFSHORE EXPRESS - NATIONAL MARINE SUPPLIER | 400.00 |
| 1/5/2017 | OFFSHORE EXPRESS - EVEREST, WORLD FUEL | 15,000.00 |
| 1/6/2017 | JENNA FITCH (BAD GIRL LUBE) | 1,914.00 |
| 1/6/2017 | OFFSHORE EXPRESS - C-PORT/STONE | 40,000.00 |
| 1/9/2017 | DISHMAN ENTERPRISES, LLC (BAD GIRL) | 8,660.22 |
| 1/9/2017 | LLOYD E OLSEN (BAD GIRL) | 2,825.00 |
| 1/11/2017 | OFFSHORE EXPRESS - MOTOR SERVICES HUGO STAMP | 5,600.00 |
| 1/17/2017 | OFFSHORE EXPRESS - AVID | 95,000.00 |
| 1/18/2017 | OFFSHORE EXPRESS - GLOBAL AGENT | 16,000.00 |
| 1/23/2017 | OFFSHORE EXPRESS - MAPLES & CALDER | 19,200.00 |

4842-2245-2845 v6
2942535-000001

| 1/26/2017 | OFFSHORE EXPRESS - AVID | 34,000.00 |
| 6/16/2017 | KALLOP ENTERPRISES | 12,500.00 |
| 6/22/2017 | AVID PALM BEACH, LLC | 2,000.00 |
| 9/29/2017 | OFFSHORE EXPRESS - I/C TRANSFER | 13,000.00 |
| | **SUBTOTAL: 10/1/16-10/1/17** | **$2,865,098.49** |
| | **GRAND TOTAL** | **$8,841,808.21** |

3

**Exhibit D**

(Steve Williams Transfers)

| | | |
|---|---|---|
| 7/12/2016 | STEPHEN WILLIAMS | $      2,717.29 |
| 8/16/2016 | STEPHEN WILLIAMS | 1,050,000.00 |
| 8/16/2016 | STEPHEN WILLIAMS | 141,250.95 |
| 8/17/2016 | STEPHEN WILLIAMS | 5,649.62 |
| 8/18/2016 | ALLIANCE OFFSHORE, LLC | 30,236.51 |
| 8/18/2016 | ALLIANCE OFFSHORE, LLC | 921.51 |
| 9/9/2016 | STEPHEN WILLIAMS | 9,175.34 |
| 9/14/2016 | WHITNEY GROUP, LLC | 7,458.53 |
| 9/20/2016 | STEPHEN WILLIAMS | 3,314.62 |
| 9/26/2016 | ALLIANCE HEAVY LIFT | 344,136.69 |
| 9/26/2016 | WHITNEY EXPLORATION, LLC | 1,578,947.37 |
| 9/28/2016 | ALLIANCE OFFSHORE, LLC | 412,686.25 |
| 9/28/2016 | ALLIANCE ENERGY SERVICES, LLC | 264,152.84 |
| 9/29/2016 | ALLIANCE OFFSHORE, LLC | 42,000.00 |
| 10/5/2016 | ALLIANCE OFFSHORE, LLC | 10,500.00 |
| 2/24/2017 | ALLIANCE OFFSHORE, LLC | 4,635.00 |
| | **TOTAL** | **$3,907,782.52** |

**Exhibit E**

(Other Potential Avoidance Actions)

See attached from the Debtor's Statement of Financial Affairs

| | | | | EXHIBIT A | Cause No. 17-35623 | | | | |
|---|---|---|---|---|---|---|---|---|---|

**OFFSHORE SPECIALTY FABRICATORS, LLC**
**SOFA Part 2 #3**
**Payments Within 90 Days before filing the case**

| Date | Check # | Vendor | Amount | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|---|
| 7/5/2017 | 902126 | FUELMAN FLEET CARD | 2.00 | 555 EAST AIRTEX DRIVE | | HOUSTON | TX | 77073 |
| 7/7/2017 | 63426 | BIZZUKA, INC | 150.00 | 105 CHAPEL DRIVE | | Lafayette | LA | 70506 |
| 7/7/2017 | 63422 | COMPUTER SALES & SVC INC dba TRI-PARISH NET | 1,007.86 | 1162 BARROW ST | | HOUMA | LA | 70360 |
| 7/7/2017 | 63429 | EXPERT TECHNOLOGY | 511.51 | 15063 EAST MAIN STREET | | Cut Off | LA | 70345 |
| 7/7/2017 | 63424 | LOIS OFFICE CLEANING | 230.00 | 248 LOWER COUNTRY DRIVE | | BOURG | LA | 70343 |
| 7/7/2017 | 902127 | ELITE BUSINESS SOLUTIONS | 100,000.00 | 8765 SPRING CYPRESS | SUITE L-206 | Spring | TX | 77379 |
| 7/7/2017 | 63420 | BLUE CROSS & BLUE SHIELD OF LOUISIANA | 5,494.44 | Attn: Accounts Receivable/ASO | P.O. Box 98029 | Baton Rouge | LA | 70898-9029 |
| 7/7/2017 | 63427 | JENNIFER L. BROUSSARD dba EXTERIOR DESIGNS LAWN/ | 200.00 | LANDSCAPE MAINTENANCE, LLC | P.O. BOX 509 | Houma | LA | 70361 |
| 7/7/2017 | 63431 | PITNEY BOWES GLOBAL FINANCIAL SERVICES, LLC | 418.02 | P.O. BOX 371887 | | PITTSBURGH | PA | 152507887 |
| 7/7/2017 | 63419 | CONSOLIDATED WATERWORKS D | 590.53 | P.O. BOX 630 | | HOUMA | LA | 70361 |
| 7/7/2017 | 63425 | VERIZON WIRELESS | 625.91 | P.O. BOX 660108 | | DALLAS | TX | 752660108 |
| 7/7/2017 | 63421 | FEDERAL EXPRESS CORP. | 29.22 | P.O. BOX 660481 | | DALLAS | TX | 752660481 |
| 7/7/2017 | 63423 | DS WATERS OF AMERICA, INCdba KENTWOOD SPRINGS | 310.98 | P.O. BOX 660579 | | DALLAS | TX | 752660579 |
| 7/7/2017 | 63428 | WASTE PRO OF LA, INC.612-WASTE PRO- CAJUN COUNTR | 350.00 | P.O. Box 865487 | | Orlando | FL | 32886-5487 |
| 7/7/2017 | 902128 | KOCH & SCHMIDT, LLC | 5,000.00 | 650 POYDRAS STREET | SUITE 2660 | New Orleans | LA | 70130 |
| 7/7/2017 | 63430 | THE PITNEY BOWES BACK INC PURCHASE POWER | 59.99 | P.O. BOX 371874 | | PITTSBURGH | PA | 152507874 |
| 7/13/2017 | 63432 | RONALD HAVARD C/O KYLE FINDELY, ARNOLD AND ITKIN | 450.00 | 6009 MEMORIAL DRIVE | | HOUSTON | TX | 77007 |
| 7/13/2017 | 63433 | TIDELANDS CLAIM MANAGEMENT, LLC | 300.00 | 610 S. TYLER STREET | | Covington | LA | 70433 |
| 7/21/2017 | 63437 | PHOENIX OFFSHORE SOLUTIONS, LLC | 4,140.00 | 116 KOL DR | | Broussard | LA | 70518 |
| 7/21/2017 | 902128 | ELITE BUSINESS SOLUTIONS | 85,015.56 | 8765 SPRING CYPRESS | SUITE L-206 | Spring | TX | 77379 |
| 7/21/2017 | 63434 | BLUE CROSS & BLUE SHIELD OF LOUISIANA | 41,098.84 | Attn: Accounts Receivable/ASO | P.O. Box 98029 | Baton Rouge | LA | 70898-9029 |
| 7/21/2017 | 63436 | ENCORE WELLHEAD SYSTEMS, LLC | 5,250.00 | P.O. BOX 27380 | | Houston | TX | 77227 |
| 7/21/2017 | 63438 | C & G BOATS, INC | 3,200.00 | P.O. BOX 789 | | Golden Meadow | LA | 70357 |
| 7/21/2017 | 63435 | ENTERGY LOUISIANA, LLC | 13,061.91 | P.O. BOX 8108 | | BATON ROUGE | LA | 708918108 |
| 7/28/2017 | 63446 | LOIS OFFICE CLEANING | 871.69 | 248 LOWER COUNTRY DRIVE | | BOURG | LA | 70343 |
| 7/28/2017 | 63456 | BLUE WATER CORPORATE HOUSING | 2,750.00 | 435 CORPORATE DRIVE, | SUITE 103 | Houma | LA | 70360 |
| 7/28/2017 | 63457 | BLUE WATER CORPORATE HOUSING | 2,650.00 | 435 CORPORATE DRIVE, | SUITE 103 | Houma | LA | 70360 |
| 7/28/2017 | 63450 | RONALD HAVARD C/O KYLE FINDELY, ARNOLD AND ITKIN | 480.00 | 6009 MEMORIAL DRIVE | | HOUSTON | TX | 77007 |
| 7/28/2017 | 63455 | TIDELANDS CLAIM MANAGEMENT, LLC | 800.00 | 610 S. TYLER STREET | | Covington | LA | 70433 |
| 7/28/2017 | 63441 | BLUE CROSS & BLUE SHIELD OF LOUISIANA | 3,270.63 | Attn: Accounts Receivable/ASO | P.O. Box 98029 | Baton Rouge | LA | 70898-9029 |
| 7/28/2017 | 63452 | JENNIFER L. BROUSSARD dba EXTERIOR DESIGNS LAWN/ | 200.00 | LANDSCAPE MAINTENANCE, LLC | P.O. BOX 509 | Houma | LA | 70361 |
| 7/28/2017 | 63442 | DIRECTV, INC | 30.00 | P.O. BOX 105249 | | Atlanta | GA | 30348-5249 |
| 7/28/2017 | 63449 | DISA, INC | 723.00 | P.O. BOX 120314 | DEPT. 890314 | DALLAS | TX | 753120314 |
| 7/28/2017 | 63451 | ELLENDALE COUNTRY CLUB, INC | 400.39 | P.O. BOX 22 | | Houma | LA | 70361 |
| 7/28/2017 | 63444 | SOUTH LA ELECTRICAL COOP | 2,138.87 | P.O. BOX 4037 | | HOUMA | LA | 70361 |
| 7/26/2017 | 63447 | TERMINIX PEST CONTROL INC | 400.00 | P.O. BOX 6001 | | HOUMA | LA | 70361 |
| 7/26/2017 | 63440 | CINTAS CORPORATION | 407.54 | P.O. BOX 650838 | | DALLAS | TX | 752650838 |
| 7/28/2017 | 63448 | VERIZON WIRELESS | 616.48 | P.O. BOX 660108 | | DALLAS | TX | 752660108 |
| 7/28/2017 | 63443 | FEDERAL EXPRESS CORP. | 36.51 | P.O. BOX 660481 | | DALLAS | TX | 752660481 |
| 7/28/2017 | 63445 | DS WATERS OF AMERICA, INCdba KENTWOOD SPRINGS | 309.83 | P.O. BOX 660579 | | DALLAS | TX | 752660579 |
| 7/28/2017 | 63453 | WAGEWORKS, INC | 80.40 | P.O. BOX 8363 | | Pasadena | CA | 91109-8363 |
| 7/28/2017 | 63454 | WASTE PRO OF LA, INC.612-WASTE PRO- CAJUN COUNTR | 340.00 | P.O. Box 865487 | | Orlando | FL | 32886-5487 |
| 7/28/2017 | 63439 | WAL-MART STORES EAST, LP WAL-MART LOUISIANA, LLC | 2,384.72 | P.O. BOX 530934 | | ATLANTA | GA | 303530934 |
| 8/3/2017 | 902129 | PREMIUM ASSIGNMENT CORP | 6,027.14 | C/O UPSTREAM BROKERS | 2020 N. MEMORIAL | Houston | TX | 77007-8320 |
| 8/4/2017 | 63463 | BIZZUKA, INC | 150.00 | 105 CHAPEL DRIVE | | Lafayette | LA | 70506 |
| 8/4/2017 | 63461 | COMPUTER SALES & SVC INC dba TRI-PARISH NET | 992.92 | 1162 BARROW ST | | HOUMA | LA | 70360 |
| 8/4/2017 | 63465 | EXPERT TECHNOLOGY | 511.51 | 15063 EAST MAIN STREET | | Cut Off | LA | 70345 |
| 8/4/2017 | 63462 | LOIS OFFICE CLEANING | 1,075.98 | 248 LOWER COUNTRY DRIVE | | BOURG | LA | 70343 |
| 8/4/2017 | 63460 | KEN BUNDY | 120.00 | 6503 AMBERCREST COURT | | Spring | TX | 77389 |
| 8/4/2017 | 902130 | ELITE BUSINESS SOLUTIONS | 152,949.65 | 8765 SPRING CYPRESS | SUITE L-206 | Spring | TX | 77379 |
| 8/4/2017 | 63464 | ELLENDALE COUNTRY CLUB, INC | 418.27 | P.O. BOX 22 | | Houma | LA | 70361 |
| 8/4/2017 | 63458 | CONSOLIDATED WATERWORKS D | 307.56 | P.O. BOX 630 | | HOUMA | LA | 70361 |
| 8/4/2017 | 63459 | FEDERAL EXPRESS CORP. | 29.15 | P.O. BOX 660481 | | DALLAS | TX | 752660481 |
| 8/8/2017 | 63467 | TIMCYN CONSULTING, LP | 9,000.00 | 14735 QUAIL GROVE LN. | | Houston | TX | 77079 |
| 8/8/2017 | 902131 | KOCH & SCHMIDT, LLC | 50,000.00 | 650 POYDRAS STREET | SUITE 2660 | New Orleans | LA | 70130 |
| 8/8/2017 | 63466 | BILLMAN OIL & GAS MANAGEMENT | 11,100.00 | 6019 CAMELLIA ST. | | HOUSTON | TX | 77007 |
| 8/8/2017 | 902132 | PHELPS DUNBAR | 50,000.00 | P.O. BOX 974798 | | DALLAS | TX | 753974798 |
| 8/16/2017 | 902133 | JACKSON WALKER, LLP | 5,556.25 | P.O. BOX 130989 | | Dallas | TX | 75313-0989 |
| 8/17/2017 | 63476 | MICKEL HAHN | 450.00 | 1344 Cenora Lane | | Hixson | TN | 37343 |
| 8/17/2017 | 63477 | RICHARD JACKSON | 300.00 | 22 PREACHER POWELL RD. | | CARRIERE | MS | 39426 |
| 8/17/2017 | 63474 | RONALD HAVARD C/O KYLE FINDELY, ARNOLD AND ITKIN | 450.00 | 6009 MEMORIAL DRIVE | | HOUSTON | TX | 77007 |
| 8/17/2017 | 902134 | ELITE BUSINESS SOLUTIONS | 137,462.44 | 8765 SPRING CYPRESS | SUITE L-206 | Spring | TX | 77379 |
| 8/17/2017 | 63475 | JENNIFER L. BROUSSARD dba EXTERIOR DESIGNS LAWN/ | 200.00 | LANDSCAPE MAINTENANCE, LLC | P.O. BOX 509 | Houma | LA | 70361 |
| 8/17/2017 | 63472 | A-1 PROFESSIONAL ANSWERNGSERVICE, INC | 128.00 | P.O. BOX 2852 | | LAFAYETTE | LA | 705022852 |
| 8/17/2017 | 63473 | TERMINIX PEST CONTROL INC | 200.00 | P.O. BOX 6001 | | HOUMA | LA | 70361 |
| 8/17/2017 | 63471 | SIRIUS XM RADIO | 151.97 | P.O. BOX 78054 | | PHOENIX | AZ | 850628054 |
| 8/17/2017 | 63470 | ISN SOFTWARE CORPORATION | 3,960.00 | P.O. BOX 841808 | | DALLAS | TX | 752841808 |
| 8/17/2017 | 63468 | CLASSIC BUSINESS PRODUCTS | 745.88 | 7828 HWY 182 EAST | | MORGAN CITY | LA | 70380 |
| 8/17/2017 | 63469 | CINTAS CORPORATION | 480.56 | P.O. BOX 650838 | | DALLAS | TX | 752650838 |
| 8/22/2017 | 902135 | ELITE BUSINESS SOLUTIONS | 15,200.00 | 8765 SPRING CYPRESS | SUITE L-206 | Spring | TX | 77379 |
| 8/22/2017 | 63481 | DS WATERS OF AMERICA, INCdba KENTWOOD SPRINGS | 242.93 | P.O. BOX 660579 | | DALLAS | TX | 752660579 |
| 8/22/2017 | 63482 | WAGEWORKS, INC | 77.99 | P.O. BOX 8363 | | Pasadena | CA | 91109-8363 |
| 8/22/2017 | 63478 | BLUE CROSS & BLUE SHIELD OF LOUISIANA | 9,198.08 | P.O. Box 98029 | | Baton Rouge | LA | 70898-9029 |
| 8/22/2017 | 63480 | ENTERGY LOUISIANA, LLC | 12,536.09 | P.O. BOX 8108 | | BATON ROUGE | LA | 708918108 |
| 8/22/2017 | 63479 | DIRECTV, INC | 34.25 | P.O. BOX 105249 | | Atlanta | GA | 30348-5249 |
| 8/28/2017 | 63488 | MICKEL HAHN | 480.00 | 1344 Cenora Lane | | Hixson | TN | 37343 |
| 8/28/2017 | 63489 | RICHARD JACKSON | 320.00 | 22 PREACHER POWELL RD. | | CARRIERE | MS | 39426 |
| 8/28/2017 | 63486 | BLUE WATER CORPORATE HOUSING | 2,650.00 | 435 CORPORATE DRIVE, | SUITE 103 | Houma | LA | 70360 |
| 8/28/2017 | 63485 | RONALD HAVARD C/O KYLE FINDELY, ARNOLD AND ITKIN | 480.00 | 6009 MEMORIAL DRIVE | | HOUSTON | TX | 77007 |
| 8/28/2017 | 63483 | SOUTH LA ELECTRICAL COOP | 2,227.73 | P.O. BOX 4037 | | HOUMA | LA | 70361 |
| 8/28/2017 | 63484 | VERIZON WIRELESS | 446.53 | P.O. BOX 660108 | | DALLAS | TX | 752660108 |
| 8/28/2017 | 63487 | WASTE PRO OF LA, INC.612-WASTE PRO- CAJUN COUNTR | 350.00 | P.O. Box 865487 | | Orlando | FL | 32886-5487 |
| 9/1/2017 | 902136 | ELITE BUSINESS SOLUTIONS | 71,987.70 | 8765 SPRING CYPRESS | SUITE L-206 | Spring | TX | 77379 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9/1/2017 | 63490 | ACADIAN AMBULANCE SERVICEdba ACADIAN TOTAL SECL | 615.20 | P.O. BOX 93444 | | LAFAYETTE | LA | 70509 |
| 9/11/2017 | 63502 | BIZZUKA, INC | 150.00 | 105 CHAPEL DRIVE | | Lafayette | LA | 70506 |
| 9/11/2017 | 63494 | COMPUTER SALES & SVC INC dba TRI-PARISH NET | 992.92 | 1162 BARROW ST | | HOUMA | LA | 70360 |
| 9/11/2017 | 63504 | EXPERT TECHNOLOGY | 511.51 | 15063 EAST MAIN STREET | | Cut Off | LA | 70345 |
| 9/11/2017 | 63498 | LOIS OFFICE CLEANING | 876.54 | 248 LOWER COUNTRY DRIVE | | BOURG | LA | 70343 |
| 9/11/2017 | 63495 | AT&T | 1,411.61 | P.O. BOX 105262 | | ATLANTA | GA | 303485262 |
| 9/11/2017 | 63496 | AT&T | 97.58 | P.O. BOX 105262 | | ATLANTA | GA | 303485262 |
| 9/11/2017 | 63501 | DISA, INC | 341.00 | P.O. BOX 120314 | DEPT. 890314 | DALLAS | TX | 753120314 |
| 9/11/2017 | 63503 | ELLENDALE COUNTRY CLUB, INC | 846.70 | P.O. BOX 22 | | Houma | LA | 70361 |
| 9/11/2017 | 63499 | A-1 PROFESSIONAL ANSWERNGSERVICE, INC. | 128.00 | P.O. BOX 2852 | | LAFAYETTE | LA | 705022852 |
| 9/11/2017 | 63500 | TERMINIX PEST CONTROL INC | 200.00 | P.O. BOX 6001 | | HOUMA | LA | 70361 |
| 9/11/2017 | 63497 | DS WATERS OF AMERICA, INCdba KENTWOOD SPRINGS | 244.16 | P.O. BOX 660579 | | DALLAS | TX | 752660579 |
| 9/11/2017 | 63491 | WAL-MART STORES EAST, LP WAL-MART LOUISIANA, LLC | 582.70 | P.O. BOX 530934 | | ATLANTA | GA | 303530934 |
| 9/11/2017 | 63492 | CINTAS CORPORATION | 407.54 | P.O. BOX 650838 | | DALLAS | TX | 752650838 |
| 9/11/2017 | 63493 | CONSOLIDATED WATERWORKS D | 115.88 | P.O. BOX 630 | | HOUMA | LA | 70361 |
| 9/11/2017 | 63505 | HOUMA BEARING SERVICE | 47.18 | 1881 GRAND CAILLOU ROAD | | Houma | LA | 70363 |
| 9/11/2017 | 902137 | VICTORY PARK MANAGEMENT | 50,000.00 | 227 West Monroe Street | Suite 3900 | Chicago | IL | 60606 |
| 9/13/2017 | 902138 | VICTORY PARK MANAGEMENT | 50,000.00 | 227 West Monroe Street | Suite 3900 | Chicago | IL | 60606 |
| 9/15/2017 | 63512 | MICKEL HAHN | 450.00 | 1344 Cenora Lane | | Hixson | TN | 37343 |
| 9/15/2017 | 63513 | RICHARD JACKSON | 300.00 | 22 PREACHER POWELL RD. | | CARRIERE | MS | 39426 |
| 9/15/2017 | 63511 | RONALD HAVARD C/O KYLE FINDELY, ARNOLD AND ITKIN | 450.00 | 6009 MEMORIAL DRIVE | | HOUSTON | TX | 77007 |
| 9/15/2017 | 63507 | BLUE CROSS & BLUE SHIELD OF LOUISIANA | 5,236.26 | P.O. Box 98029 | | Baton Rouge | LA | 70898-9029 |
| 9/15/2017 | 63508 | BLUE CROSS & BLUE SHIELD OF LOUISIANA | 7,351.37 | P.O. Box 98029 | | Baton Rouge | LA | 70898-9029 |
| 9/15/2017 | 63509 | DIRECTV, INC | 94.25 | P.O. BOX 105249 | | Atlanta | GA | 30348-5249 |
| 9/15/2017 | 63510 | LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY | 5,444.80 | P.O. BOX 4311 | | Baton Rouge | LA | 708214311 |
| 9/18/2017 | 902139 | ELITE BUSINESS SOLUTIONS | 63,379.78 | 8765 SPRING CYPRESS | SUITE L-206 | Spring | TX | 77379 |
| 9/19/2017 | 63514 | ENTERGY LOUISIANA, LLC | 12,501.26 | P.O. BOX 8108 | | BATON ROUGE | LA | 708918108 |
| 9/20/2017 | 902140 | KOCH & SCHMIDT, LLC | 5,000.00 | 650 POYDRAS STREET | SUITE 2660 | New Orleans | LA | 70130 |
| 9/28/2017 | 63517 | MICKEL HAHN | 450.00 | 1344 Cenora Lane | | Hixson | TN | 37343 |
| 9/28/2017 | 63518 | RICHARD JACKSON | 300.00 | 22 PREACHER POWELL RD. | | CARRIERE | MS | 39426 |
| 9/28/2017 | 63516 | BLUE WATER CORPORATE HOUSING | 2,650.00 | 435 CORPORATE DRIVE, | SUITE 103 | Houma | LA | 70360 |
| 9/28/2017 | 63515 | RONALD HAVARD C/O KYLE FINDELY, ARNOLD AND ITKIN | 450.00 | 6009 MEMORIAL DRIVE | | HOUSTON | TX | 77007 |
| 9/29/2017 | 63522 | COMPUTER SALES & SVC INC dba TRI-PARISH NET | 1,007.81 | 1162 BARROW ST | | HOUMA | LA | 70360 |
| 9/29/2017 | 902141 | ELITE BUSINESS SOLUTIONS | 61,538.49 | 8765 SPRING CYPRESS | SUITE L-206 | Spring | TX | 77379 |
| 9/29/2017 | 63524 | JENNIFER L. BROUUSARD dba EXTERIOR DESIGNS LAWN/ | 200.00 | LANDSCAPE MAINTENANCE, LLC | P.O. BOX 509 | Houma | LA | 70361 |
| 9/29/2017 | 63521 | SOUTH LA. ELECTRICAL COOP | 2,358.87 | P.O. BOX 4037 | | HOUMA | LA | 70361 |
| 9/29/2017 | 63523 | VERIZON WIRELESS | 421.98 | P.O. BOX 660108 | | DALLAS | TX | 752660108 |
| 9/29/2017 | 63525 | WAGEWORKS, INC | 82.81 | P.O. BOX 8363 | | Pasadena | CA | 91109-8363 |
| 9/29/2017 | 63526 | WASTE PRO OF LA. INC 612-WASTE PRO- CAJUN COUNTR | 1,062.65 | P.O. Box 865487 | | Orlando | FL | 32886-5487 |
| 9/29/2017 | 63519 | BLUE CROSS & BLUE SHIELD OF LOUISIANA | 7,582.31 | P.O. Box 98029 | | Baton Rouge | LA | 70898-9029 |
| 9/29/2017 | 63520 | FEDERAL EXPRESS CORP. | 19.66 | P.O. BOX 660481 | | Dallas | TX | 752660481 |
| | | TOTAL | 1,121,286.22 | | | | | |